# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2458 | **DATE** | 6/29/2004 |
| **CASE TITLE** | Trustees of The Chicago Painters an vs. Salma Darwan, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ___ ___.

(3) ☐ Answer brief to motion due _____ . Reply to answer brief due_____ _.

(4) ☐ Ruling/Hearing on _____ set for _____ at __ ___.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on __ ___ set for _____ at ____ ___.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at ____ __.

(7) ☐ Trial[set for/re-set for] on _____ at __ ___.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at ___ ___.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court finds in favor of Plaintiffs, but grants the parties 21 days to file an agreed-upon calculation of damages, if possible. If they are unable to stipulate to the relevant figures, the parties are invited to submit separate proposals within 21 days.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | *2* number of notices | |
| | Notified counsel by telephone. | **JUN 3 0 2004** date docketed | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 6/29/2004 date mailed notice | |
| ETV | courtroom deputy's initials | ETV mailing deputy initials | |

U.S. DISTRICT COURT
CLERK

2004 JUN 29 PM 6: 02

Date/time received in central clerk's office

FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TRUSTEES OF THE CHICAGO )
PAINTERS AND DECORATORS )
PENSION, HEALTH AND WELFARE, )
AND DEFERRED SAVINGS PLAN TRUST )
FUNDS, )
)
      Plaintiffs, )
)
      v. )
)
SALMA DARWAN, d/b/a ROYAL )
INTERNATIONAL & DECORATING, INC., )
a putative corporation, n/k/a ROYAL )
INTERNATIONAL DRYWALL & )
DECORATING, INC., an Illinois )
Corporation, )
)
      Defendant. )

DOCKETED

JUN 3 0 2004

No. 01 C 2458

Judge Rebecca R. Pallmeyer

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Trustees of the Chicago Painters and Decorators Pension, Health and Welfare,

and Deferred Savings Plan Trust Funds, filed this action on April 9, 2001 against Defendant Salma

Darwan ("Darwan"), d/b/a Royal International & Decorating, Inc., n/k/a Royal International Drywall &

Decorating, Inc. The complaint, brought under section 301 of the Labor Management Relations

Act ("LMRA"), as amended, 29 U.S.C. § 185(a), and §§ 502 and 515 of the Employee Retirement

and Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1132 and 1145, seeks an

order requiring Defendant to pay contributions for hours that Plaintiffs claim were worked by certain

of Defendant's employees but not reported to Plaintiffs. In addition, Plaintiffs seek interest, fees,

costs, liquidated damages, and an equitable accounting. Although actions to collect contributions

to employee benefit plans are standard fare in our court, Plaintiffs here present an unusual theory:

that the court should ignore payroll records that are inaccurate and instead calculate hours worked

based on the amount of raw material used by the allegedly-underpaying employer. As the court

finds the payroll records in this case are largely unreliable, the court adopts this theory for the



circumstances of this case. For the reasons set forth below, the court finds in favor of Plaintiffs, but stays entry of judgment to permit the parties to address the proper calculation of damages.

## FACTUAL BACKGROUND[1]

### I.    Agreements

This case arises out of a series of collective bargaining agreements ("CBAs") between Defendant Royal and the Painters' District Council No. 14 ("PDC 14"), the Chicago affiliate of the International Brotherhood of Painters and Allied Trades ("the Union"),[2] and the Agreement and Declaration of Trust establishing Plaintiff Funds (the "Declaration") (together with the CBAs, the "Agreements"). (Ex. A to Pls.' Ex. 1; Pls.' Exs. 3-8.) Under the Agreements, signatory employers contribute to local welfare, pension, and deferred savings plan funds (the "Funds") on behalf of employees who are PDC 14 members. Plaintiffs claim that Defendant breached the Agreements during the period October 1, 1999 through March 31, 2000 by failing to report and contribute

---

[1]    The facts presented here are derived from evidence presented at an eight-day bench trial held on April 15-17 and 22-23, May 23-24, and June 25, 2002, as well as exhibits entered into the record. The court notes that the parties did not explain or even refer to the vast majority of the thousands of pages of documents entered into the record as "exhibits," usually without any objection. In fact, from the court's perspective, the parties did nothing more than punch three holes in the fruits of their discovery—all of it—and put the documents in binders. Moreover, to the extent the parties have failed to give this court guidance with regard to the several hundred time sheets (and other unidentified documents) in the record, they bear the risk that the court has misinterpreted or misunderstood those documents.

[2]    Defendant was bound by successive CBAs between PDC 14 and the Painting and Decorating Contractors of America ("PDCA"), an association of coatings application contractors, see http://www.pdca.org/Join_PDCA.htm, from May 23, 1994 through May 31, 2002. (Plaintiffs' Proposed Findings of Fact ¶ 10; Defendant's Proposed Findings of Fact ¶ 3.) The only CBA between the PDCA and PDC 14 in the record covers the period June 1, 1997 through May 31, 2002. (Pls.' Ex. 3.)

Defendant has also been bound by successive CBAs between PDC 14 and the Gypsum Drywall Contractors of Northern Illinois/Chicagoland Association of Wall and Ceiling Contractors. (Plaintiffs' Proposed Findings of Fact ¶ 11.) The CBA covering the period June 1, 1997 through May 31, 2000, and another for the period June 1, 1999 through May 31, 2004 are in the record. (Pls.' Exs. 4-5.) Although these two CBAs overlap, the latter does not explicitly supersede the former.

For purposes of this lawsuit, all relevant provisions in these three CBAs are substantially the same.

2

amounts for some of the hours worked for covered employees on drywall taping and finishing work. Defendant contends that reports it submitted to Plaintiffs do accurately reflect the hours worked by those employees.

Under the CBAs, which apply to all work relating to drywall finishing, (Pls.' Exs. 3-5 art. III § 6(b)), Defendant agreed to make contributions to the Funds "for each hour worked by each Employee covered by this Agreement." (Id. arts. VI-VIII § 1(a)(i).)[3] If Defendant fails to furnish reports and make required contributions by the 20th day of the month after work is performed, Plaintiffs may assess liquidated damages of ten percent of the amount owed "to defer administrative costs." (Id. arts. VI-VIII § 1(c).) Defendant must furnish Plaintiffs with employee information such as names, classifications, social security numbers, and wages, (id. arts. VI-VIII § 3(a)), and Plaintiffs or PDC 14 may audit any of Defendant's records relating to payment of wages and benefits, either directly or through a representative, "whenever such examination is, in their sole discretion, deemed necessary" to ascertain compliance with the CBAs. (Id. arts. VI-VIII § 3(b).) If the auditor determines that during the audit period Defendant has underpaid contributions and/or wages, Defendant is "liable for the costs of the examination, including, but not limited to, audit fees and any reasonable attorneys' fees." (Id.) If Plaintiffs retain legal counsel to collect delinquent contributions or wages, Defendant is liable for "reasonable attorney's fees and for all reasonable costs incurred in the collection process, including fees incurred for the recovery of liquidated damages, interest, audit costs, filing fees, and any other expenses incurred by" Plaintiffs. (Id. arts. VI-VIII § 3(c).) Failure to pay such expenses or contributions after reasonable notice by Plaintiffs is considered a breach of the CBAs. (Id. arts. VI-VIII § 4.)

The Declaration, which is incorporated into the CBAs, (id. arts. VI-VIII § 2(a)), authorizes

---

[3]     Article VI of the CBAs governs the Health and Welfare Fund, article VII the Pension Fund, and article VIII the Deferred Savings Plan Fund. For purposes of this lawsuit, all relevant provisions in articles VI through VIII of the CBAs are substantially the same.

Plaintiffs to initiate legal proceedings to collect unpaid contributions. (Pls.' Exs. 6-8[4] art. IV § 2.) For any unpaid contributions, Defendant is liable for liquidated damages of the greater of $50 or 1-½ percent per month during which the contributions remain unpaid, plus reasonable attorney's fees and costs, including court fees and audit fees. (*Id.* art. IV § 4.)

Defendant urges that Plaintiffs have not submitted "evidence of any obligation by Salma Darwan[5] to submit contributions to Plaintiffs," (Defendant's Proposed Findings of Fact (hereinafter, "D.F.") ¶ 2), and that Mr. Darwan therefore is not personally liable to Plaintiffs in this action. (Defendant's Proposed Conclusions of Law ¶¶ 3-4.) The record reflects that Royal was incorporated in 1992, and that Darwan has been owner and an officer of Royal since that time. (T.T., at 58-59.) The court is unable to determine, however, when Royal International & Decorating was incorporated, or why Plaintiffs' complaint labels it "a putative corporation."[6] Absent any evidence that the court should pierce the corporate veil to find Darwan personally liable, the court concludes that Royal is the only properly named Defendant.

## II.    Defendant's Drywall Taping and Finishing Process

Darwan testified that Defendant Royal is engaged primarily in drywall installing, taping, and painting for residential tract housing projects. (T.T., at 58-59, 65, 800-01.)[7] Under the standard

---

[4]    Exhibits 6-8 are the Declarations of the Pension Fund; the Welfare Fund; and Exhibit 8 of the Deferred Savings Plan Fund, respectively. For purposes of this lawsuit, all relevant provisions in the Declarations of Trust are substantially the same.

[5]    The record refers to Mr. Darwan as "Salma Darwan," "Hysam Darwan," and "Sam Darwan."

[6]    The court notes that the Illinois Secretary of State's electronic corporate records database indicates that Royal International Decorating, Inc. and Royal International Drywall, Inc. were both incorporated on May 26, 1999, but were dissolved involuntarily for unstated reasons, on a date not stated. That site also shows that Royal International Drywall & Decorating, Inc. was incorporated on April 28, 2000, that Darwan serves as its President and Secretary, and that it is currently in good standing. *See* http://www.cyberdriveillinois.com/CorpSearchWeb/corpsrch.html.

[7]    Darwan defined a "residential" structure as "anything that's not three stories with an
(continued...)

4

industry procedure for drywall taping and finishing (the process that follows drywall installation), known as a "level four finish," tapers apply a mixture of gypsum powder and water ("compound") to the seams between drywall boards, place a strip of tape over the compound, overlay another layer of compound and tape, allow the compound to dry, and sand and smooth the tape. (*Id.* at 67, 103, 290, 391, 810-11.)[8]

As discussed below, Plaintiffs claim that the number of drywall boards that Defendant used during the period October 1, 1999 through March 31, 2000 suggests that it under-reported the number of hours worked by its tapers and finishers. Plaintiffs support this contention by citing construction industry estimates of the number of boards an average worker tapes and finishes in an hour. Defendant claims that the taping and finishing hours it reported are accurate, and that in any event the modern equipment and methods it uses enable its workers to tape and finish drywall boards more quickly than the industry estimates Plaintiffs and their experts rely on.

Defendant submitted a videotape showing one of Defendant's journeymen and an apprentice taping what Darwan claimed was "a typical house." (T.T., at 802; Def.'s Ex. 70.5.) The videotape shows the journeyman using a device called a "bazooka" to apply the tape, while the apprentice followed behind wiping off the excess compound, resulting in a smooth surface that was ready for painting, wallpaper hanging, or other finishes. (T.T., at 67, 812-13; Def.'s Ex. 70.5.) For ceilings 11 feet or higher ("cathedral ceilings"), the tapers used stilts and applied "flex tape," a product introduced within the past ten years that, according to Darwan, reduced taping time for

---

[7](...continued)
elevator," and indicated that tract housing subdivisions offer buyers four or five models with various options. (T.T., at 65, 838.)

[8]    For a standard level four finish, tapers apply three coats of compound to corner beads (i.e., metal at the corner of a wall), screw heads, and trim. (T.T., at 103.) Darwan claimed that he directs Defendant's employees to apply two coats, rather than three, to those surfaces, as he claims "the [coating] material has changed." (*Id.* at 103, 821, 824.) Darwan did not indicate when this change occurred.

such ceilings from two hours under the previous method to fewer than ten minutes. (T.T., at 811, 822, 829-31, 833-34; Def.'s Ex. 70.5.) Darwan did not indicate, however, whether Defendant began using flex tape prior to the October 1, 1999 to March 31, 2000 time period at issue here, stating only that he was introduced to flex tape "a few years back." (T.T., at 834.) To reach 17-foot ceilings in two-story foyers, the tapers assembled planks and ladders, which took about a minute. (T.T., at 814-15; Def.'s Ex. 70.5.) Before applying the second coat of compound, the tapers "knock[ed] down the rough edges on the entire house," a process that, according to Darwan, typically takes ten to fifteen minutes. (T.T., at 823; Def.'s Ex. 70.5.) Defendant's tapers then "fire taped" the garage, i.e., applied only one layer of compound and tape to the drywall, which took one hour in the video. (T.T., at 333, 825; Def.'s Ex. 70, at 13.)[9] Overall, Darwan calculated that Defendant stocked 222 drywall boards and budgeted 48.5 hours for the project on the video tape, thus indicating that it anticipated a production rate of 4.58 boards per hour. (Def.'s Ex. 70, at 13.) The two workers actually worked 21.5 hours, yielding an overall production rate of 5.16 boards per hour for each worker, including one-half hour spent fire taping 26 boards. (Id.; T.T., at 825.) Accounting for material that was "wasted" (i.e., portions that were cut to decrease the board's size), an amount equivalent to 39.10 boards, Darwan determined that each worker's production rate based on boards actually taped was 4.25 boards per hour. (Id.)[10] Plaintiffs do not dispute these

---

[9]     Darwan did not explain why he referred to this type of taping as "fire taping." He noted that the journeyman and apprentice on the video tape took 30 minutes to fire tape the garage and two hours to sweep and clean compound from the floors. (T.T., at 825, 827; Def.'s Ex. 70.5.) Defendant also notes that Jeffrey Johnston, a Specialty Products Representative with United States Gypsum Corporation, testified that it takes approximately one hour to fire tape 24 boards of drywall in a garage. (T.T., at , 662-63, 673.) Defendant claims that the formula used in Plaintiffs' audit of Defendant (discussed below) assumes that a garage requires more than nine hours to tape, while sweeping and cleaning takes 10 to 15 hours, but offers no support for these contentions. (Defendant's Proposed Findings of Fact ¶¶ 41, 43; T.T., at 825, 827.)

[10]     As discussed below, however, Darwan acknowledged that when a door or window is cut out of a drywall board, more taping is required than for an intact drywall board. (Id. at 963-65.) It is not clear whether Darwan accounted for such increased taping time in his calculations.

6

calculations as accurate for the work recorded on the videotape.

As noted above, however, Plaintiffs do dispute the number of boards Defendant's workers tape and finish in an hour on average. The parties implicitly agree that the size of those boards, and where and how they are placed, affect that rate. During the period October 1, 1999 through March 31, 2000, 95 percent of the drywall boards Defendant purchased measured four feet by twelve feet; approximately two and a half percent of the drywall installed on Defendant's project sites was "double boarded," i.e., two layers of drywall are installed, but only the outer layer is taped and finished. (T.T., at 75, 954, 965-66.)[11]

## III. Compensation of Defendant's Tapers

John Hull ("Hull"),[12] Apprentice Coordinator/Instructor for PDC 14's Chicago Drywall Finishers Apprenticeship Program, claimed that, until approximately 20 years ago, most tapers were compensated on the basis of "piecework," i.e., per board taped, and that this typically resulted in greater compensation for the same amount of work than compensation on an hourly basis. (Id. at 418, 422-23.) He asserted, however, that due to an increase in hourly wages (he did not explain when or why this increase transpired), hourly compensation is now more favorable for employees than piecework remuneration. (Id. at 423.) According to Defendant's expert witness, Jeffrey Johnston ("Johnston"), a Specialty Products Representative with United States Gypsum

---

[11]    Although the record does not define the term "double boarded," Darwan testified that, in "double layering," two layers of drywall are installed to slow the spread of a fire, but only the outer layer is taped and finished. (T.T., at 873.) The court presumes these terms describe the same process. Defendant implies that workers can tape and finish more boards per hour when boards are double boarded, as only the outer layer is taped in double boarding.

[12]    Plaintiffs proposed Hull as an expert witness, and on April 10, 2002, this court denied without prejudice Defendant's motion in limine to bar Hull's testimony. At trial, Defendant's counsel objected to Hull's expert opinion on the grounds that "he is not an expert in how much drywall can be done" and "his statements are all based only on hearsay." (T.T., at 444.) The court overruled that objection, finding that Hull had ample expertise and non-hearsay information stemming from his many years performing drywall taping and finishing work and training apprentices in taping and finishing, including those employed by Defendant itself. (Id. at 445.) Hull's opinion was therefore admitted into the record. (Id.; Pls.' Ex. 26.)

Corporation, it remains standard practice in the construction industry to pay residential drywall tapers on a piecework basis. (*Id.* at 662-63, 682.) Plaintiffs' expert, Steve Klomfar ("Klomfar"), a Senior Estimator with Service Decorating Company, Inc. ("Service Decorating"), a competing drywall business, also testified that piecework compensation results in less pay for tapers.[13] (*Id.* at 388.) According to Klomfar, Service Decorating paid its tapers on a piecework basis until June or July 1998, when Justin Avey, Service Decorating's owner, began paying tapers for all hours worked because, according to Klomfar, Avey "was coming into religion" and decided that piecework compensation "wasn't right." (*Id.* at 408-09.) For two years after Service Decorating made this change, Klomfar asserted, it did not win any residential work because its bids were higher than those of other contractors. (*Id.* at 412.)

JoAnne Betts ("Betts") was a payroll administrator for Service Decorating from 1989 to 1992. In the fall of 1995,[14] she took a position with Defendant, performing similar work. It is undisputed that when she worked for Service Decorating, Ms. Betts determined employees' pay by dividing a gross dollar amount for each employee[15] by the union wage scale for tapers, and using the figure to assign to each employee the number of hours "worked." (D.F. ¶ 133; T.T., at 222-23.) Darwan, who was a Service Estimator for Service Decorating until 1992, testified that he may have paid his employees similarly on a piecework basis when he founded Defendant in 1992. (T.T., at 69.) The parties agree that around the time Betts began working for Defendant in the fall of 1995, Darwan or another of Defendant's employees told Betts to use the same payroll method

---

[13]     Klomfar did not state whether he agreed with Hull that at some earlier date compensation on the basis of piecework was better for tapers than hourly pay.

[14]     Betts did not indicate where she worked, if at all, between 1992 and 1995.

[15]     The record does not indicate who gave Betts these gross amounts or what they represented. The court presumes these amounts bore some relation to the number of drywall boards taped, however, as Klomfar testified that Service Decorating paid its tapers piecework until June or July 1998. (T.T., at 408-09.)

8

she had used at Service Decorating to compensate tapers and carpenters (i.e., drywall installers). (D.F. ¶ 135; T.T., at 228-230.)[16] Specifically, Betts stated that one of Defendant's Superintendents, Pablo Lopez ("Lopez"), gave her the gross dollar amount for each taper and carpenter, which she converted to hours. (T.T., at 230-31.) Betts then submitted these hours to an unidentified employee, who produced the time sheets. (Id. at 231.) Betts also recorded these hours on the Union fringe benefit reports. (Id. at 232.) Defendant does not challenge Betts's testimony regarding how she determined payroll hours while employed by Service Decorating and, later, by Royal. Although Defendant points out that Betts does not know how Defendant has compensated its employees since the spring of 1996, when she left Defendant's employ, (id. at 237-38), the court notes that Defendant has presented no evidence of the date on which, if at all, it ceased compensating its tapers in the manner Betts described.

As discussed below, Plaintiffs maintain that Defendant continued the practice of paying its employees on a piecework basis through at least March 31, 2000, rather than for hours actually worked as required by the CBAs, and therefore that Defendant's payroll records for covered taping and finishing workers through that date are inaccurate. The time sheets on which Defendant records its taping and finishing employees' hours show the hours worked by all members of a work crew for a given work week. (See, e.g., Pls.' Ex. 42.) These sheets include columns for the

---

[16]    Betts claimed that, either in her interview for employment with Defendant or shortly after her employment began, Darwan told her to perform payroll "the same as we did at Service"; she understood this statement to mean that she should "change gross dollars into hours." (T.T., at 228.) Darwan could not recall whether Betts ever did payroll work for Defendant, but he denied telling Betts to perform payroll as she had done at Service Decorating, and insisted that he never instructed any of his employees to convert dollar amounts to hours worked. (Id. at 76-78.) This testimony is inconsistent with Darwan's concession that he may have paid his employees on a piecework basis when he founded Defendant in 1992. (See id. at 69.) In any event, Defendant acknowledges that "[i]n an interview for employment, [Betts] was told to do payroll in the same manner as at Service." (D.F. ¶ 135.) As discussed above, Defendant argues, and the court agrees, that Darwan is not properly a party to this case. (See id. ¶ 2; Defendant's Proposed Conclusions of Law ¶¶ 3-4.) Thus, the parties in interest to this action—Defendant Royal and Plaintiffs—agree that Darwan or another of Defendant's agents told Betts to perform payroll in the same manner as she had done at Service Decorating.

9

number of boards taped, number of boards fire taped,[17] "unit hours" budgeted by Defendant, "extra" budgeted hours that the superintendent[18] or employee added for larger-than-anticipated rooms or skylights, hours worked daily by each crew member (Monday through Saturday), and total hours worked. (Id.; T.T., at 880-81, 997-98, 1002-03.) The court notes, however, that only five of the 263 time sheets for the period October 1, 1999 through March 31, 2000 record daily hours worked; the remainder list only weekly totals. Darwan claimed he relied on the workers themselves to report their own hours pursuant to an industry-wide "honor system," as at any given moment Defendant has more than 30 work crews spread over a 4,000 square mile area and cannot place a punch clock at, or assign a supervisor to, every work site. (T.T., at 880, 974-75.) Defendant notes that the CBAs do not address the format of time sheets. (D.F. ¶ 81.) The court notes, however, that, as discussed below, ERISA requires an employer to keep records of its employees' hours sufficient to permit the calculation of benefits. 29 U.S.C. § 1059(a)(1).

Defendant claims that it did compensate its tapers for all of the hours they actually worked during the relevant period. In support, Defendant notes that David Valdez ("Valdez"), who since approximately February 2001 has served as Defendant's Assistant Superintendent, testified that Defendant pays its tapers by the hour, and that Eduardo Haro, who has been a taper for Defendant since at least October 1995, testified that Defendant pays him by the hour. (T.T., at 718, 996.) Haro also claimed that, whenever he felt he could not meet the hours budgeted, a superintendent would increase them at his request. (Id. at 720-21, 738.) Lopez testified that, when tapers told him they could not meet the budget, he would ask them, "How come you cannot finish the house with the hours I am giving you?" (Id. at 774.) If Lopez agreed with the reasons the tapers gave him,

---

[17]     As noted earlier, Defendant's tapers "fire tape" garages, i.e., they apply only one layer of compound and tape. (T.T., at 333, 825.)

[18]     Darwan testified that Defendant's superintendents are responsible for supervising work crews. (T.T., at 96-97.)

10

he claimed, he would increase the budgeted hours. (*Id.*) Lopez added that he did not always inform Darwan that he had increased the budgeted hours in this manner. (*Id.* at 794.)[19] Similarly, Valdez testified that when a taper requested more hours than were budgeted for rooms that were larger than anticipated or that included skylights, he would "go to the house and check it out and . . . make sure that that house needs more hours." (*Id.* at 997-98.) If Valdez approved the increase in budgeted hours, he stated, he instructed the employee to record these hours in the "extra hours" column on the time sheets. (*Id.* at 997-98, 1002-03.) Valdez claimed that on one occasion in 2001 Sanchez asked him to add extra hours for a project, and that he did so. (*Id.* at 998.) It appears in fact that Defendant's supervisors routinely added such "extra hours" to the budgets: during the relevant period, 220 of the 263 time sheets show such extra hours. It also appears, however, that the addition of these extra hours did not disturb the balance between hours budgeted and hours recorded as worked: of the 220 time sheets showing extra hours, budgeted and worked hours matched on 154 sheets (70 percent), while of the 43 time sheets recording no extra hours, budgeted and worked hours were the same on 33 sheets (77 percent). In the court's view, this evidence supports the inference that during the relevant period, Defendant compensated its tapers on a piecework or project basis rather than by the number of hours worked. Workers who are compensated hourly would presumably not concern themselves with whether they exceed their employer's budget; that would be a matter of concern only for the employer.

_____

[19]     On cross-examination, Darwan testified that he fired Lopez in late 1999 or early 2000 because several customers had complained about Lopez and because Lopez had gone over budget. (T.T., at 97, 943.) Also on cross-examination, Lopez testified that he was fired because (1) he "was not supervising the workers properly," (2) Darwan "was displeased with the fact that the people under [his] supervision were working more hours than [were] budgeted," and (3) "customers were complaining about the quality of the work." (*Id.* at 771, 791-92.) Neither party challenges this testimony on hearsay grounds. The record does not explain how often Lopez or the workers he supervised went over budget. Lopez denied that he was fired because Darwan believed he had changed time sheets without authority. (*Id.* at 792.) The court is uncertain how Lopez knew what Darwan believed about this matter, nor is the court aware how Lopez learned that customers complained about Lopez's own work.

Haro implied that he always recorded all of the hours that his crew worked. (*Id.* at 721-22; 736-37.)[20] As noted earlier, however, it is undisputed that in 1995 and 1996, Defendant simply converted the number of boards its employees (including Haro) taped into compensable hours, rather than recording (or instructing employees to record) the hours they worked. (D.F. ¶¶ 133, 135; T.T., at 222-25, 228, 230-32.) The court notes that on all of the 11 time sheets in the record on which Haro's name appears (during the period October 1995 through January 1996), total crew hours and hours budgeted are the same. Seven of these 11 sheets indicate that one crew member (generally Haro) worked more hours than the others, (Pls.' Ex. 50), although Haro testified at his deposition that he and the other members of his crew arrived at and left work together and always worked the same number of hours. (T.T., at 709-10, 743-44.) At trial, Haro acknowledged that when there was not enough work for the entire crew to work 40 hours, he would send the other crew members home while he stayed to finish the job. (*Id.* at 748.)[21]

The record contains 263 time sheets for Defendant's taping and finishing work crews for the period October 1, 1999 through March 31, 2000. (Pls.' Ex. 48.)[22] Of these, 187 record that the crew worked precisely the number of hours that had been budgeted for the week. (*Id.*)[23] The court notes that at least two of these 187 sheets support Plaintiffs' contention that hours reported as

---

[20]    Specifically, Haro stated "if I work 8 hours, I would just [record] 8 hours," and claimed that he was paid for all overtime hours he worked overtime and that he recorded "the hours that each person work[ed]." (T.T., at 721-22; 736-37.)

[21]    Of the remaining eight time sheets, four indicate that Haro worked between 4.25 and 21.5 hours more than the other crew members, and four show equal hours for all crew members.

[22]    The court notes that none of the time sheets in Plaintiffs' Exhibit 48 include Bates stamp numbers. Thus, the court is unable to provide more specific citations to these sheets.

[23]    Of the 76 remaining time sheets, 22 indicate that the crew worked more hours than were budgeted for the week, while 54 suggest that the crew was under-budget. Klomfar testified that, in his experience on residential projects, crew hours equal hours budgeted only five to ten percent of the time. (T.T., at 407-08.) The court notes, however, that an additional six time sheets that record hours for one two-man work crew (Robert Clinton and Marion Bush) do not show any budgeted hours, but do record hours for each day. (Pls.' Ex. 48.)

12

worked by Defendant's tapers were adjusted to fit a pre-determined budget: First, on a November 21, 1999 time sheet, there is an alteration whereby the first crew member's hours were increased from 28 to 29, while other crew members worked 28 hours, yielding a total (113) identical to budgeted hours. (*Id.*) Second, an undated sheet recording hours for Jose Moreno's crew (discussed below) shows a hand-written calculation dividing the number of hours budgeted (156.25) by the number of crew members (4); the sheet assigns 39.25 hours to Moreno (the crew chief), while each remaining crew member is reported to have worked only 39 hours. (Pls.' Ex. 46, Bates No. 93.)[24] Although the parties fail to address these time sheets, in the court's view, these notations demonstrate that in at least some instances, time sheets were manipulated such that the hours for which tapers were paid conformed to the number of hours budgeted for the project.

Luis Sanchez, Jr. and Jose Moreno are two members of PDC 14 who performed taping and finishing work for Defendant and served as foremen of their individual crews. Sanchez and Moreno claim that their time sheets grossly under-reported the hours they worked during the period October 1, 1999 through March 31, 2000. Sanchez worked for Defendant from June or July 1998 until December 2001, and Moreno did so between March 1999 and October 2001. (T.T., at 126-27, 151-52, 167, 779; Def.'s Exs. 102-03.) Plaintiffs contend that Sanchez's and Moreno's testimony and time sheets demonstrate that Defendant compensated them for each drywall board taped or house completed, rather than per hour worked. (Plaintiffs' Proposed Findings of Fact (hereinafter, "P.F.") ¶¶ 37, 44.) Regardless of the method Defendant used to compensate its tapers, as discussed below, the court finds that the time sheets do not accurately reflect hours actually worked.

---

[24]     The court notes that although the time sheets in Plaintiffs' Exhibit 46 include Bates stamp numbers, Exhibit 46 contains one fewer time sheet than in Exhibit 48 for Moreno's crew during the relevant period. As discussed in note 22 above, none of the time sheets in Plaintiffs' Exhibit 48 include Bates stamp numbers.

## A. Luis Sanchez, Jr.'s Crew

The witnesses at trial disputed who recorded the hours for Sanchez's crew. Sanchez testified on direct examination that Pablo Lopez entered Sanchez's hours during that period, and that Sanchez's crew did not know how many hours they would be paid for until they received their paychecks and a copy of their completed time sheets at the end of the week. (T.T., at 116-19.) On cross-examination, however, he acknowledged that for an unspecified number of weeks in 2000 or 2001, his wife completed his crew's time sheets (she, unlike Sanchez, is fluent in English) and submitted them to Defendant via fax or telephone. (*Id.* at 126-27, 139, 156-57.) Sanchez claimed that when his wife completed the time sheets, he directed her to record "the hours that they would give me for that house, and . . . to distribute them so they would be the same hours even if I worked more." (*Id.* at 139.) According to Sanchez, when he and his wife recorded his crew's hours, one of Defendant's superintendents would tell him how many hours his crew was expected to work that week and, if those hours exceeded budgeted hours, the superintendent would reduce the hours worked at the end of the week to match the budgeted hours. (*Id.* at 169-70, 176.)

As noted, Defendant challenges this testimony. Superintendent Lopez asserted that Defendant's tapers recorded their own hours on their time sheets: "They . . . write their hours, the hours that they worked." (*Id.* at 794.) Lopez did not mention Sanchez specifically, however, and Darwan himself did not know who recorded the hours for Sanchez's crew. (*Id.* at 93, 95-96.) Defendant notes that David Valdez, who since approximately February 2001 has served as Defendant's Assistant Superintendent, testified that time sheets are due on Sunday, but that approximately every other week, Sanchez failed to give Valdez his time sheets on time. (T.T., at 1003.) Defendant also points out that Brian Power, who became one of Defendant's superintendents on May 15, 2001, has seen Sanchez complete his own time cards at Defendant's office. (D.F. ¶ 320 (citing T.T., at 690).) Power in fact stated that on ten to twelve occasions,

14

Sanchez "would ask me for the hours, and he would get the budgeted hours and he would fill them out at the [office]." (T.T., at 689-90.) Power added that Sanchez asked for the budget in order "to fill out his time card," (*id.* at 699), thus suggesting that Sanchez recorded the hours worked for his crew based on the hours budgeted for the assignment rather than on the hours they actually spent on the job.

The parties do not address how this testimony regarding the accuracy of Defendant's time sheets after the period October 1, 1999 through March 31, 2000 is relevant. If the practice Valdez and Power describe was similar to what Sanchez did in the relevant time frame, that practice supports Plaintiffs' contention that the time sheets were not accurate records. In any event, the fact that Sanchez himself was involved in preparing reports does not exonerate Defendant. As discussed below, under ERISA, Defendant is responsible for producing accurate time sheets, and may not hide behind sloppiness on the part of its subcontractors or subordinates as an excuse for failure to meet this obligation.

Sanchez asserted that Defendant compensated his crew by converting the number of drywall boards they taped each week to hours, based on a piecework rate of $5 or $5.50 per board, and that the hours recorded were far fewer than the hours his crew actually worked. (*Id.* at 140, 145, 182, 188-89.) The 20 time sheets listing Sanchez's hours for the period October 1, 1999 through March 31, 2000 (only one of which shows daily hours worked) indicate that Sanchez worked between 18 and 49 hours per week (35.3 average). (Pls.' Exs. 42, 48.)[25] According to Sanchez, these records are grossly inaccurate: Sanchez testified that he in fact worked "up to 50 to 60 hours" per week during this period, including nearly all Saturdays. (T.T., at 120, 167-68.) Sanchez asserted that he complained to Darwan "many times" regarding this underpayment (*id.*

---

[25]     The court notes that although the time sheets in Plaintiffs' Exhibit 42 include Bates stamp numbers, as with Moreno's crew, Exhibit 42 contains eight fewer time sheets for Sanchez's crew during the relevant period than are in Exhibit 48. As discussed in note 22 above, none of the time sheets in Plaintiffs' Exhibit 48 includes Bates stamp numbers.

at 127); Darwan denied this contention. (Id. at 891.) Although Sanchez insisted that Defendant paid him on a "piecework" basis, he acknowledged that, in approximately September 2001, he told a Union representative that he was being paid by the hour. At trial, he explained that he had lied to the representative for fear that Darwan would become angry with him. (Id. at 155.) Sanchez conceded that he had read an October 14, 1999 memo that Darwan addressed to Defendant's drywall hangers and tapers stating that working hours were 7:00 a.m. to 3:30 p.m. (Def.'s Ex. 75.)[26] Nevertheless, he maintained that he worked more than those hours and that, in fact, "everybody was working after [3:30 p.m.]" (T.T., at 166.)

Of the 20 time sheets reflecting Sanchez's work during the period October 1, 1999 through March 31, 2000, 16 record that Sanchez's crew worked precisely the number of hours that had been budgeted for the week.[27] (Pls.' Exs. 42, 48.) Eleven of these 16 sheets indicate that the crew members did not work the same number of hours for the week, (id.), but Sanchez testified that he and the other crew members arrived at and left the work site each day at the same time and worked the same number of hours. (T.T., at 119.) Sanchez believed the reason some crew members were paid for additional hours on some time sheets is that the crew's total hours "had to match" the total hours budgeted. (Id. at 119, 125.)

Sanchez also testified that when his crew worked fewer hours than were budgeted for a week, "those hours are still owed[, and t]hey hold them over for the following week." (Id. at 143.) There is evidence to support this testimony: on several time sheets there are notations indicating that hours were added to the budget that they were being "back paid" from previous weeks. (Pls.'

---

[26]     Sanchez did not indicate at what point he read this memo, whether he believed it was false at that time, or whether he objected to anyone that the memo was false. The record does not indicate whether these are standard hours for drywall tapers industry-wide.

[27]     Of the four remaining time sheets, one indicates that Sanchez's crew worked two hours more than hours budgeted, while the remaining three sheets indicate that the crew worked 10, 14, and 16 fewer hours than were budgeted.

16

Exs. 46, 48, 50.)[28] Plaintiffs contend that Defendant employed this device to avoid paying its employees overtime. (Plaintiffs' Proposed Conclusions of Law (hereinafter, "P.C.") ¶ 85.) In fact, the court notes that of the 263 time sheets for the relevant period, only 14 record any overtime hours, while 61 indicate that at least one crew member worked precisely 40 hours.

Defendant argues that Sanchez's testimony is not credible, as "he was evasive in his answers." (D.F. ¶ 121.) To support this contention, Defendant notes that, although Sanchez testified that total hours "had to match" budgeted hours, he later acknowledged that those figures were not always the same. (T.T., at 137-38.) As noted above, however, budgeted and actual hours were identical on 80 percent of the time sheets for Sanchez's crew. Defendant also points out that, at his deposition, Sanchez testified that Defendant never put overtime hours on his time sheets, while at trial, he acknowledged that Defendant sometimes did pay him for overtime hours. (Id. at 133-34.) The court notes that only one time sheet for the period October 1, 1999 through March 31, 2000 records overtime hours for Sanchez. In the court's view, these relatively minor discrepancies in Sanchez's testimony are not significant enough to seriously undermine his credibility.[29]

---

[28]    Plaintiffs' Exhibit 50 consists of time sheets for the period October 1995 through January 1996. The time sheets are not Bates-stamped.

[29]    Defendant also contends that Sanchez "testified inconsistently at trial and at his deposition with respect to doing work at the home of [Luis] Magana." (D.F. ¶ 118.) Although Sanchez testified at trial that he had taped Mr. Magana's home, during his deposition, Sanchez claimed he had never been to, and did not know the location of, Mr. Magana's home. (T.T., at 161-63.) Sanchez explained, however, that at the time of his deposition, he had not yet been to Mr. Magana's home. (Id. at 163.) In addition, Defendant claims that "[t]he Union gave Sanchez a diary to keep track of the actual hours worked; however, despite being given this diary, he never recorded what he claims are the hours he worked." (D.F. ¶ 120.) Sanchez testified that in the fall of 2001, the Union gave him a diary "just to see the hours that I was reporting." (T.T., at 171-72.) Sanchez claimed that he had informed Defendant of the hours he recorded in his diary but that he did not record these hours on his time sheets because Defendant threatened to break up his crew if he did so. (Id. at 172, 174.) In the court's view, this testimony is not factually inconsistent.

17

### B.    Jose Moreno's Crew

Like Sanchez, Moreno claimed he was compensated by paycheck based on a rate of $5 per board of drywall taped, rather than for the hours he actually worked. (*Id.* at 182, 188-89.) Moreno claimed that Defendant's superintendents recorded his hours on all but one of his time sheets,[30] and that Moreno merely received his paycheck and a copy of his completed time sheet at the end of the week. (*Id.* at 189-90.) The 23 time sheets for Moreno's crew[31] during the period October 1, 1999 through March 31, 2000 (none of which shows daily hours worked) indicate that Moreno worked between 11 and 47 hours per week (32.69 average). (Pls.' Exs. 46, 48.) Like Sanchez, however, Moreno claimed that, during this period, he in fact worked 8 to 14 hours per day, 55 to 60 hours per week, including nearly all Saturdays. (T.T., at 188, 206.) Like Sanchez, Moreno claimed that Defendant did not pay him for all hours worked until his last two weeks with Defendant in October 2001. (*Id.* at 167.) Moreno acknowledged that, in approximately September 2001, he told a Union representative that he was happy working for Defendant and that they were paying him what he was supposed to be paid. (*Id.* at 204.) He claimed that he did not complain to Defendant that he was underpaid because "I needed the job and I was afraid I would get fired," although he acknowledged that none of Defendant's employees ever threatened to fire him. (*Id.* at 206.)

Eighteen of these 23 time sheets (78 percent) indicate that Moreno's crew worked precisely the number of hours they had been budgeted for the week.[32] (Pls.' Exs. 46, 48.) Seven of these

---

[30]    The single time sheet which Moreno claimed he completed on his own is undated, although Moreno believed it was for one of the last projects he performed for Defendant in 2001. (T.T., at 185.)

[31]    Three of these sheets do not list Moreno, but do include the other members of his crew.

[32]    The remaining five sheets indicate that total crew hours were under budget by 21, 11, 25, 1.5, and 29 hours, respectively.

18 sheets indicate that the crew members did not work the same number of hours for the week. (*Id.*) Like Sanchez, Moreno testified that he and his crew members all arrived at and left the work site each day together and worked the same number of hours. (T.T., at 183, 189.) Moreno did not know why some time sheets suggested that crew members worked different hours. (*Id.* at 182-83, 189.) He testified that none of Defendant's employees ever informed him of the budget for any of the projects he worked on. (*Id.* at 203, 205.)

Defendant implicitly argues that Moreno's testimony is not credible, noting inconsistencies in his statements. For example, while his employment application indicated that he had been paid $800.00 per week at a previous job, Moreno testified that he was not in fact paid $800.00 per week for that job. (D.F. ¶ 123; Def.'s Ex. 103; T.T., at 194.) When confronted with this discrepancy, he clarified that he had earned *approximately* $800.00 per week. (T.T., at 196.) Defendant also notes that Moreno initially testified that he worked for Defendant from 1996 through 2001, and that, until mid-1998, Lopez gave him $4.50 for each drywall board he taped. (*Id.* at 179-81.) Moreno later acknowledged, however, that Luis Sanchez, whom the court presumes was Moreno's crew leader at that time, paid him directly in cash for his taping work prior to March 1999. (D.F. ¶ 124; T.T., at 198.) In addition, Defendant points out that Moreno initially testified that he did not complete his time cards, but acknowledged that after Superintendent Jorge Chavez left Defendant's employ on an unspecified date, Moreno did complete his own time cards. (D.F. ¶ 126; T.T., at 202.) As with Sanchez, the court views these relatively minor discrepancies as insufficient to cast serious doubt on Moreno's testimony. Further, even if the court were to find Sanchez's and Moreno's testimony questionable, it would not diminish the implausibility of the time sheets submitted by Defendant during the relevant period.

## IV. Taping and Finishing Productivity Estimates

The record contains various estimates of the number of drywall boards (measuring four feet

19

by twelve feet) that an average worker can tape and finish per hour. Based on the testimony of their expert witnesses and figures found in certain trade publications, Plaintiffs claim a worker can tape and finish between 2.8 and 2.9 boards per hour. (P.C. ¶ 79.) On the testimony of its expert witnesses, Royal claims that Defendant's tapers can tape and finish more than 4 boards per hour. As discussed below, invoices showing the number of boards shipped to Defendant, and the number of hours recorded on time sheets during the period October 1999 through March 2000, indicate that to have worked the number of hours Defendant reported to Plaintiff, its workers would have to have taped and finished 3.74 boards per hour.

### A. Published Sources

The record identifies five published estimates of taper productivity found in construction cost data publications.[33] Two publishers—RSMeans and Craftsmen Book Company—estimate that tapers can provide a level four finish to 2.31 drywall boards measuring four feet by twelve feet per hour, a third (Walker) puts the figure at 3.4, while a fourth (Dodge) estimates 1.89. (Pls.' Ex. 37, at 2, 5-6; T.T., at 272, 292, 318-19.) A fifth publication, a 1999 instructional manual for the Union's drywall apprenticeship programs (the "Union Manual"), estimates that a taper using a hopper[34] or taping machine generally can tape and completely finish 2.78 boards measuring four feet by twelve

---

[33] A sixth estimate to which Defendant refers, a 1991-1994 Taping Addendum to an Area Working Agreement between Painters' District Council No. 30, covering DuPage County, Illinois, and the Northeast Illinois Chapter of the Painting and Decorating Contractors of America, states that "employees are expected to [tape and finish 1,650] square feet per each eight . . . hours worked [i.e., 4.3 boards per hour], for standard areas." (Def.'s Ex. 4, at 1.) The agreement, which is not signed and is marked "cancelled," defines "standard areas" as "rooms of eight . . . feet in height, with no slopes or vaulted ceilings." (Id. at 2.) Although Plaintiffs have not addressed this agreement, the court does not find it a reliable estimate of taper productivity, as it appears to have been part of labor negotiations that never resulted in an executed contract and was not otherwise published.

[34] The record does not define the term "hopper," or indicate whether it increases productivity as do "bazookas" (discussed above).

feet per hour. (Pls.' Ex. 27, at 32.)[35] Darwan and two of Defendant's experts challenge the productivity figure published by RSMeans and the rate in the Union Manual; they do not address the remaining three published sources.

### 1. RSMeans Manual

RSMeans publishes "Means Building Construction Cost Data" (the "RSMeans Manual"), which provides construction cost information useful for estimating.[36] As noted, RSMeans estimates that tapers can complete work on 2.31 drywall boards per hour. Defendant notes that Plaintiffs' expert Ian Parr ("Parr"), President and Principal Owner of Construction Cost Systems, which estimates construction costs, acknowledged that he was not aware of any general contractor that uses RSMeans data exclusively when submitting a contract bid, and that the contractors he was aware of use the RSMeans Manual only to fill gaps in their estimates with respect to small dollar items. (T.T., at 240, 276.) Parr also acknowledged that for a contractor submitting a bid, published productivity estimates like the RSMeans figures are "a poor second choice" to measuring the productivity of the contractor's own work crews. (Id. at 321.) The court notes, however, that the fact that a contractor does not use RSMeans data exclusively does not mean that the contractor does not use the data at all, nor does it mean the data is unreliable.

Defendant's expert John Wozniak, who has worked in various capacities for two residential

---

[35]    The relevant section of the Union Manual states,

The amount of work that one finisher can do may vary as it is dependent upon many factors, such as the type of job, the crew or the time of year. Workers or companies should keep a record of the type of job and the hours worked to get an accurate time-count for each task. Generally, when a hopper or taping machine is used, it takes 7.5 hours for one drywall finisher to completely finish 1000 sq. ft. of wallboard [i.e., 2.78 boards measuring four feet by twelve feet per hour]. This includes approximately 100 ft. of bead. However, conditions such as high walls, odd shaped rooms, and sloped ceilings can reduce this output by as much as 50% or more.

(Pls.' Ex. 27, at 32.)

[36]    See www.rsmeans.com.

21

developers (United Homes and Summit Homes) for 17 years, testified that the RSMeans Manual is "not a good tool for residential construction," as the prices it quotes are higher than actual prices, and that he was not aware of any residential builder that uses the RSMeans Manual for any purpose. (*Id.* at 639-47.) Wozniak acknowledged, however, that he is not a taper, does not receive taper productivity projections when he accepts drywall bids, has never conducted a study of drywall taper productivity, and otherwise has no knowledge of taper productivity. (*Id.* at 651-52.)

Jeffrey Johnston, the Specialty Products Representative with United States Gypsum Corporation, testified at trial that he had "never used the RSMeans manual to estimate a taping job." (T.T., at 677.) Plaintiffs note that Johnston testified at his March 11, 2002 deposition that he had in fact used the RSMeans Manual to estimate drywall work. (*Id.* at 678-79.) When confronted with this discrepancy, Johnston claimed that although he had used the manual "to estimate," he had not done so "for a specific job." (*Id.* at 679.) He conceded that the RSMeans Manual is a standard estimating source in the construction industry, but nevertheless insisted that he was not aware of any drywall contractors that use RSMeans data when submitting a project bid. (*Id.* at 679, 686.)[37]

Noting that the RSMeans Manual states that it is "aimed primarily at commercial and industrial projects costing $1,000,000 and up, or large multi-family housing projects," (Def.'s Ex. 70.6, at iv),[38] Defendant implicitly argues that using the productivity figure in the RSMeans Manual

---

[37]     Johnston did not indicate whether he was referring to residential or commercial drywall contractors, or both. Defendant also notes that in a 1995 article (which does not appear in the record), Johnston claimed that he could tape and finish an average of 8,000 square feet of drywall (167 four by twelve foot boards) in four days. (T.T., at 666-68.) The court notes that, although Johnston believed the article was attached to Defendant's Exhibit 67, there is no such exhibit in the record. Johnston's failure to indicate how many hours he spent each day or whether he was taping in a residential or commercial context, and Defendant's failure to submit the full text of the article, preclude any meaningful comparison with other productivity estimates.

[38]     Phillip Waier, a principal engineer with RSMeans, believed that the term "multi-family housing project[]" referred to a single multi-unit building, rather than to single-family homes. (T.T., (continued...)

22

to estimate the number of hours that Defendant's tapers worked is inappropriate because workers taping drywall in commercial projects can be expected to tape fewer drywall boards per hour than in residential projects.[39] Although Parr claimed that residential taping and finishing productivity rates would either be the same as, or slightly lower than, commercial rates, (T.T., at 300), other witnesses disagreed. Johnston stated that "commercial projects can take longer to tape than tract housing." (Id. at 673.) In contrast, Howard Levinson ("Levinson"), President of Levinson, Simon & Sprung ("LSS"), estimated that a commercial taper could tape and finish 3.46 boards per hour, while a residential taper's productivity rate would be 2.86. (Id. at 501, 533.)

Darwan claimed that taping productivity is higher in residential buildings for several reasons: some, but not all of Darwan's testimony supports that claim. First, according to Darwan, in commercial taping, drywall is installed vertically, which means, he asserts, that 25 percent more seams must be taped than for horizontally-installed residential boards. (Id. at 804, 835.) Second, Darwan stated, for commercial projects, Defendant can anticipate the sizes of the boards it will need, while in a residential context most of the boards it purchases measure four feet by twelve feet and are then cut to the appropriate size. (Id. at 806-07, 863, 963.) The court notes, however, that although this practice might increase the number of boards used in residential construction, Darwan acknowledged that where boards are cut for windows or doors, those areas must be taped also. (Id. at 963-64.)[40] Further, the court presumes that smaller pieces of drywall would result in more seams for which taping and finishing is required. Although Darwan implied that Defendant accounts for cut and removed material for windows and doors, but not for smaller rooms, in

---

[38](...continued)
at 1023; D.F. ¶ 377.)

[39]     As noted earlier, Darwan testified that Defendant is engaged primarily in residential drywall installing, taping, and painting. (T.T., at 58-59, 800-01.)

[40]     Darwan did not indicate whether the amount of material removed for doors and windows differs for commercial and residential contexts.

preparing its budgets, he did not explain why it does so. (Id. at 964-65.) Third, Darwan claimed, on commercial jobs, taping material is stored in a central location, requiring that tapers "wait for [their] turn for the elevator[, where they] could wait 10 to 15 minutes." (Id. at 835-36.) Fourth, he stated, tapers in commercial projects must devote time to building scaffolding to tape elevator shafts. Darwan acknowledged, however, that for residential taping work, a crew has to drive between job sites, while in commercial taping, units are all on the same site. (Id. at 976.)

To support its claim that commercial taping takes longer than residential taping, Defendant notes that, according to Darwan, Plaintiffs' auditor "tested" four of Royal's jobs. (T.T., at 868.)[41] Three of the tested jobs were residential tract housing projects for which an overall productivity rate of 3.15 boards per hour was recorded, while the fourth, a commercial condominium project, showed a productivity rate of 1.94 boards per hour. (Id.; Def.'s Ex. 70, at 11.) Regardless of the merits of Defendant's claim that productivity for residential taping is higher than for commercial taping, the court notes that Defendant does not provide its own credible estimate of expected average taping and finishing rates for residential tract housing jobs.

### 2. Union Manual

Together with another member of the Union's Drywall Finisher Curriculum Committee (the "Committee"),[42] John Hull, the Apprentice Coordinator/Instructor for PDC 14's Chicago Drywall Finishers Apprenticeship Program, developed the productivity figure in the Union Manual (2.78 boards measuring four feet by twelve feet per hour). Hull testified that in his view this rate reflects a national average for both residential and commercial taping. (Id. at 434-35, 442, 444; Pls.' Ex. 27, at 1-2, 5, 32.) According to Hull, that figure remained unchanged after it was submitted for

---

[41]     Neither Defendant nor Darwan explained their use of the term "tested," and the court notes there is no documentary evidence in the record relating to such testing.

[42]     The members of this Committee consist of Hull and three other Union apprenticeship coordinators, as well as Johnston and a representative of Ames Taping Tools. (Pls.' Ex. 27, at 5.)

comment to the Committee and to the Union's 300 joint partnership and training programs nationwide. (*Id.* at 438, 440.)

Johnston, who was also a member of the Committee, testified that he asked Committee members whether they believed this production rate was accurate, and that one Committee member responded that the figure was "just a benchmark, a guideline." (*Id.* at 670-71.) Plaintiffs note that at Johnston's deposition, however, he testified that he did not express any disagreement with the productivity figure set forth in the Manual. (*Id.* at 676-77) In any event, Defendant offered no evidence suggesting that the "benchmark or guideline" adopted by the Committee was far lower than an accurate productivity estimate would have been.

### B.    Plaintiffs' Experts

Steve Klomfar, the Service Decorating Senior Estimator, stated that when estimating taper productivity, Service Decorating assumes a baseline rate of three boards per hour, then adjusts this estimate downward for ceilings that are not uniformly flat, e.g., vaulted ceilings or ceilings shaped like a barn roof, and adjusts the rate upward for fire taping (i.e., garage work). (*Id.* at 413-14; Def.'s Ex. 36, at 2.) According to Klomfar, for level four taping and finishing work on 13 residential tract housing projects during the period October 1999 through March 2000, Service Decorating budgeted between 2.48 and 3.71 boards per hour (3.08 average) per project, while actual taper productivity was 2.03 to 3.31 boards per hour (2.62 average). (T.T., at 388-95, 587; Pls.' Exs. 32, 57.)[43]

---

[43]    Defendant points to two other projects with higher budgets, which Klomfar explained were "apartment jobs." (Def.'s Exs. 49, 62; T.T., at 558-59.) Defendant claims that the RSMeans Manual is not applicable to its tapers because the Manual is aimed primarily at commercial, industrial, or "large multi-family housing projects." (Def.'s Ex. 70.6, at iv.) The court presumes that Defendant does not engage in multi-unit residential housing work, and therefore disregards productivity rates for taping and finishing work in apartment projects. Similarly, the list prepared by Klomfar includes projects specifying the number of houses, units, or floors. (Pls.' Exs. 32, 57.) The court presumes that projects listing units and floors were in fact multi-unit dwellings, and therefore has excluded those productivity figures from the Service Decorating calculations.

(continued...)

25

John Hull believed that one worker cannot tape and finish more than 2.8 boards per hour, whether for residential or commercial projects. (*Id.* at 424-26.)[44] Ian Parr reviewed six industry cost estimation manuals, disregarded the highest estimate (Walker's 3.4) and lowest estimate (Dodge's 1.89), and averaged the remaining four (he did not identify these four); according to Parr, the RSMeans and Craftsmen figure (2.31) was "in the middle of that pack." (*Id.* at 272, 292, 318-19.) As "it is possible that a larger organization with more sophisticated supervision and training resources could perhaps improve productivity by as much as 10-20 percent," Parr's "aggressive" upper-bound estimate for taping and finishing productivity for providing a level four finish was 2.77 boards per hour. (Pls.' Ex. 37, at 3.) Parr acknowledged, however, that this estimate did not account for fire taping garages and fire taping shared attic walls in duplexes, or for double boarding. (T.T., at 334-35.)[45] Parr further observed that, as the industry as a whole employs all available taping and finishing technologies, a subcontractor who could consistently achieve a productivity rate higher than that "would initially win every bid in open competitive bidding" and that such a high rate could only be achieved by "some external or non-industry standard of practice." (*Id.* at 1, 4.)

Parr conceded that his company prepares estimates for developers and architects, not for

---

[43](...continued)
Defendant also notes that, for four other residential projects dated between August 13, 1998 and October 26, 2001, Service Decorating estimated rates of 3.25 to 3.5 boards per hour. (Def.'s Exs. 45, 48, 58, 61.) Klomfar acknowledged that Service Decorating relied on higher baseline productivity rates until recently (he did not know when), attributing this change to "a learning curve." (T.T., at 559.)

[44]     Although Hull claimed that garages take the same amount of time to tape as other rooms in a house, (*id.* at 428), the court finds this contention implausible in light of other testimony and Defendant's videotape, discussed above.

[45]     As discussed in note 11 above, the court presumes that the term "double boarding" refers to placing two boards to slow the spread of a fire, (T.T., at 873), and as only the outer layer is taped, Defendant implies that workers can tape and finish more boards per hour when boards are double boarded.

general contractors or subcontractors like Defendant, that he has never performed an estimate for a single-family tract housing project, and that he has little knowledge concerning worker productivity for single-family tract homes. (*Id.* at 261, 313.) He also conceded that he did not conduct any tests to determine whether his productivity figure was accurate for tract housing in Chicago, did not submit his figures to anyone outside of his company for their review, and did not measure the taping productivity of any drywall work crews. (*Id.* at 261-64.) Parr also acknowledged that, while he assumed 10 percent for waste (i.e., portions of a drywall board that are cut for doors and windows or to decrease the board's size), he has never personally measured wastage for a drywall contractor. (Pls.' Ex. 37, at 3; T.T., at 295, 322-23, 963.) He also conceded his estimates were based on RSMeans data, rather than on any measured changes in taping productivity for ceilings. (T.T., at 329.) Defendant claims that Parr's productivity figure is unreliable because "the techniques or methodology at issue cannot be tested," have not been subject to peer review and publication, have an unknown rate of error, and "have not been generally accepted by the relevant community." (Defendant's Proposed Conclusions of Law (hereinafter, "D.C.") ¶ 24 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993)).)

As Service Decorating's workers taped and finished as many as 3.31 boards per hour, Parr's "aggressive" upper-bound estimate of 2.77 boards per hour arguably does not truly represent an upper-bound limit for taper productivity.[46] Nevertheless, the court finds these experts' testimony admissible and probative for the limited purpose of determining the *average* (rather than upper-bound) productivity rate of Defendant's tapers. *Cf. SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003), *aff'd* 365 F.3d 1306 (Fed. Cir. 2004) ("In a bench trial it is an acceptable alternative to admit evidence of borderline admissibility and give it the (slight)

---

[46]     For the same reason, Hull's upper-bound figure of 2.8 boards per hour is suspect.

weight to which it is entitled").[47]

## C. Defendant's Estimate

Darwan believed that his tapers' production rate is probably "way over 4 [boards] an hour . . . not counting double layers" for taping and finishing. (T.T., at 910-11.)[48] Although Darwan did not indicate how Defendant determines budgets for taping and finishing work, a cursory review of Defendant's time sheets reveals that it assumed tapers would complete between 4 and 4.15 boards per hour (excluding double boarding). (See Pls.' Exs. 42, 46.)[49] As noted earlier, Darwan testified that Defendant budgeted 4.58 boards per hour for the project on the video tape, while the actual production rate was 4.25 boards per hour. (Def.'s Ex. 70, at 13.)

## V. Levinson, Simon & Sprung Audits

### A. Fringe Benefit Audit

In early 2000, Gerald Harms ("Harms"), a Trustee of Plaintiff Funds and Business Manager of PDC 14, asked Howard Levinson of Levinson, Simon & Sprung, to conduct a fringe benefit contribution compliance audit of Defendant's records for the period October 1, 1998 through March 31, 2000. (T.T., at 475-76, 501, 618-19; P.F. ¶ 104.) LSS found that Defendant owed

---

[47]     Plaintiffs point to an informal survey of 21 residential union contractors conducted at Parr's direction by Jim Davis ("Davis"), a construction cost estimator for Construction Cost Systems, and another Construction Cost Systems employee (whom the record identifies only as "Sean"), resulting in productivity figures between 1.3 and 4.68 boards per hour (on average 2.73 boards per hour). (Pls.' Ex. 39, at 1-2; T.T., at 304-06.) Defendant implicitly argues that the court should decline to consider the survey on the grounds that it is riddled with methodological problems and constitutes hearsay. Even were the court to decide that the survey is not hearsay, its informal nature and the extremely broad range of responses obtained make it a dubious source for determining average taper productivity.

[48]     As noted, Defendant implies that workers can tape and finish more boards per hour when boards are double boarded, as only the outer layer is taped. As the court understands this testimony, Darwan was suggesting that Defendant's workers can tape and finish far in excess of 4 boards per hour.

[49]     Darwan did not indicate whether his assumption also excluded fire taped boards.

28

Plaintiffs $1,900.52 in benefits based on "payroll and cash disbursements"[50]; Defendant does not dispute that it owes Plaintiffs this amount. (Pls.' Ex. 20; P.F. ¶¶ 110, 141; T.T., at 986-87.)[51]

## B.    Material Audit

Suspecting that Defendant was compensating its tapers on a piecework, rather than hourly, basis, Harms asked Levinson in early 2000 to conduct a "material audit" to compare Defendant's reported taper hours to the drywall materials Defendant had purchased during the period October 1, 1999 through March 31, 2000 (the "material audit period"). (T.T., at 502; Pls.' Ex. 12, at 2.)[52] In early 2000, Levinson obtained from John Hull a copy of the Union Manual, discussed above, which suggested that a taper using a hopper or taping machine generally can tape and completely finish 2.78 four feet by twelve feet boards per hour. (T.T., at 442, 504; Pls.' Ex. 27, at 1-2, 32.) Levinson, however, assumed that a taper could tape and finish 1,100 square feet of drywall boards in an eight hour day, or 2.86 four by twelve feet boards per hour, as he felt that from

---

[50]    The record does not explain the term "payroll and cash disbursements," but the court presumes it refers to unpaid pension fund contributions determined by examining Defendant's payroll records and cash disbursement journals. *Cf. Laborers' Pension Fund v. A & C Envtl., Inc.,* 301 F.3d 768, 771, 778 (7th Cir. 2002) (noting that plaintiff pension funds claimed employer's records were inadequate because of absence of a cash disbursement journal and a certain payroll register, which plaintiff believed might reveal the existence of additional covered workers who were not included in the audit report).

[51]    Plaintiffs also claim that the LSS audit indicates that Defendant owes Plaintiffs $23,875.50 "in unpaid liquidated damages for work months from September[] 1998 through July[] 2000." (P.F. ¶ 143.) Darwan acknowledged that the audit indicated that Defendant owed $23,000 in liquidated damages, but did not know whether it was accurate. (T.T., at 985-86.) This amount does not appear in the audit, however, and Plaintiffs provide no support for their contention that Defendant owes this amount.

[52]    Marie Smith, an LSS auditor, testified that this type of audit was "a relatively new technique." (T.T., at 477.) Defendant points out that, when Defendant's counsel asked Darwan whether Plaintiffs had audited Defendant before 2000, Darwan responded that Plaintiffs had ordered two benefit and material audits of Defendant, the most recent of which was conducted by LSS, and that neither audit indicated that Defendant's time sheets were incomplete or otherwise unacceptable. (T.T., at 872-73.) Defendant provides no support for Darwan's contentions, however, and in any event does not indicate how these earlier audits cast doubt upon the material audit at issue in this case.

his experience eight hours "was a more standard day" than the 7-½ hour day assumed in the Union manual. (T.T., at 504; Pls.' Ex. 27, at 32.) In April 2000, according to Levinson, Justin Avey and another individual (whom Levinson could not recall) at Service Decorating confirmed that Levinson's productivity figure "fell within the standards of what they were using." (*Id.* at 505-06.)[53]

Using invoices showing the number of boards shipped to Defendant and the number of hours recorded on time sheets during the material audit period, Marie Smith ("Smith"), an LSS auditor, determined that Defendant had reported that its workers taped and finished 166,890 boards in 44,582.5 hours (i.e., 3.74 boards per hour). (*Id.* at 477-78, 482, 621-22; Pls.' Ex. 13, at 4; Pls.' Ex. 20.)[54] Employing Levinson's 2.86 boards per hour rate, Smith calculated that Defendant in fact should have reported 58,353.12 hours, i.e., that it had under-reported 13,770.62 hours during the six month material audit period.

Smith then used the contribution rates set forth in the CBAs to determine that Defendant owes $51,641.25 to the Pension Fund, $6,885.50 to the Savings Fund, and $54,395.45 to the Welfare Fund. (Pls.' Ex. 12, at 2.) Smith's material audit report also indicates that Defendant owes $688.55 to "Cooperation," $3,580.46 to "CDFAF," $413.13 to "CDFIAF," and $137.71 to the Scholarship Fund. (*Id.*) In addition, the report claims Defendant owes $1,063.96 for work performed in the geographic area covered by Painters' District Council No. 30 ("PDC 30"), i.e., DuPage County, Illinois,[55] and $836.56 for work in the area covered by PDC 33. (*Id.*; D.F. ¶¶ 257-

---

[53]     Although this statement arguably is hearsay (unless it is offered for its effect on Levinson), Defendant does not challenge it on hearsay grounds, and any such argument is waived.

[54]     Smith testified that, for the material audit, she "reviewed drywall invoices, . . . the contribution reports that [Royal] submitted[,] and . . . the tapers' time sheets." (T.T., at 478.) According to Smith, LSS did not attempt to determine whether the time cards and the contribution reports were the same. (*Id.* at 604.) Absent evidence to the contrary, the court presumes that Defendant's contribution reports and time cards show the same number of hours worked.

[55]     *See* http://www.paintersdc30.com.

Defendant disputes the amount determined in the material audit "in its entirety," claiming that it "is neither based upon hours worked by employees nor hours [for which] Royal owes contributions on behalf of any specific employee." (D.F. ¶ 261.) Defendant claims it is not liable to PDC 14 for funds assertedly owed to other District Councils. (Id. ¶ 60.) It also notes that Cooperation, CDFAF, CDFIAF, and the Scholarship Fund are not parties to this suit, and claims therefore that it owes no contributions to Plaintiffs for these amounts. (Id. ¶ 262; D.C. ¶¶ 5-6.)

As discussed above, Defendant notes that, according to Darwan, LSS audited four of Defendant's jobs which indicated that Defendant's tapers had productivity rates of 3.04, 2.61, 3.67, and 1.94 per hour respectively. (D.F. ¶ 65; T.T., at 868; Def.'s Ex. 70, at 11.) Darwan calculated that, based on the total sheets taped and total hours reported, the combined production rate for these four projects was 2.95 boards per hour. (Def.'s Ex. 70, at 11.)[57]

In addition, Defendant points out that Levinson did not know whether the productivity rate used in the Union Manual, on which his productivity figure was based, accounted for double layer boards, triple-layer boards,[58] 54-square-inch boards, whether drywall is installed vertically or horizontally, drywall waste, fire taping, or the use of apprentices (whom Levinson acknowledged are less efficient than journeymen). (T.T., at 516-21.) In fact, Darwan calculated that, after subtracting estimated fire taped drywall, double layers, and 13 percent waste, the production rate

---

[56]     The record does not indicate the location of PDC 33. Defendant claims that PDC 33 and PDC 14 have merged, although it does not indicate when this merger took place. (D.F. ¶ 259.) Plaintiffs do not address this contention.

[57]     Defendant's emphasis on these audit results is curious, as they suggest that Defendant's claimed productivity rate of more than 4 boards per hour, and even the 3.74 boards per hour overall rate recorded on its time sheets, is too high.

[58]     As discussed in note 11, Darwan testified that, in "double layering," two layers of drywall are installed to slow the spread of a fire, but only the outer layer is taped and finished. (T.T., at 873.) Although the record does not define the term "triple layer boards," the court assumes that the process involves three layers of drywall, only the outer layer of which is taped.

for drywall taped and finished it reported during the audit period was in fact 2.63 boards per hour, rather than the 3.74 boards per hour rate the Levinson audit determined. (D.F. ¶ 71; Def.'s Ex. 111; T.T., at 873-75.) The court notes, however, that in estimating the number of drywall boards fire taped, Darwan assumed that his workers can tape and finish 26 boards per hour, a figure based solely on the fact that the two workers in the videotaped house, discussed above, took one-half hour to fire tape 26 boards. (T.T., at 873.) The court doubts that the time spent by two workers to fire tape 26 boards for a single project truly reflects an accurate estimate of the time Defendant's average workers spend fire taping. The court also notes that during the period October 1, 1999 through March 31, 2000, 95 percent of Defendant's drywall board purchases measured four feet by twelve feet, while only two and a half percent of the drywall installed on Defendant's project sites was double boarded. (*Id.* at 75, 954.) In any event, Defendant has not shown that any of the published sources failed to account for fire taping, double layers, or waste and, thus, that the court cannot meaningfully compare Defendant's overall production rate (including fire taped and double boarded and waste) with the published estimates found in the record. The court also notes that according to Defendant's counsel, Defendant hires "far more apprentices" than other contractors, (T.T., at 521-22), thus implying that, all other factors being equal, Defendant's tapers in fact take longer to tape and finish drywall boards than other contractors. Thus, it appears that Defendant was benefitted to the extent LSS credited these slower workers with installing boards at the faster journeyman worker rate. For the reasons explained below, the court concludes that the material audit provides a more accurate picture of the hours Defendant's tapers likely worked during the audit period than do Defendant's own time sheets.

## C. Comparison of Painter and Taper Hours

In addition to the fringe benefit and material audits, Levinson determined that, for

32

employees who had worked for Defendant nine months or more during the year 1999 (deemed full-time workers), Defendant's tapers reportedly had worked on average 1,487 hours, while its painters had worked 1,879 hours on average. (T.T., at 510-11; Pls.' Ex. 16.) Levinson testified that the latter figure is consistent with workers in all of the building trades which his firm audits, including electricians, cement masons, plumbers, laborers, and sheet metal workers. (T.T., at 511.)

Darwan insisted that there is no relationship between taping and painting hours, as painter hours on a residential construction project vary according to whether doors, stairs, rails, basement steel, baseboards, windows, window sills, siding, fascia,[59] and soffits[60] must be painted. (Id. at 857-59.) He also claimed that painters often paint only part of one house, then move to another, while tapers complete one house before starting another. (Id. at 885.) Darwan maintained that a comparison of painters' and tapers' hours is "comparing apples to oranges"; nevertheless, he pointed out that there were 52,347 total painter hours (rather than those of employees who had worked for Defendant nine months or more) during the period October 1999 through March 2000, and 48,106 taper hours, and that, for two months during that period, total taper hours exceeded total painter hours. (Id. at 861; Def.'s Ex. 110(A).) The court notes, however, that Defendant has failed to provide the *average* hours its painters and tapers worked during 1999.

Although the record does not identify the average taper hours for other construction companies, Levinson's figures provide a further indication that Defendant under-reported its tapers' hours. Assuming that an average painter and taper work 50 weeks per year, the court notes that Defendant's painters who were employed nine months or more worked 37.58 hours per week, while

---

[59]     Fascia is "a horizontal piece (as a board) covering the joint between the top of a wall and the projecting eaves." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 422 (10th ed.1997). Darwan defined fascia as "what the gutters go on on the outside of the house." (T.T., at 859.)

[60]     A soffit is "the underside of a part or member of a building (as of an overhang or staircase)." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1116 (10th ed.1997). Darwan defined a soffit as "the return" for a gutter on the outside of a house. (T.T., at 859.)

similarly-situated tapers worked only 29.74 hours per week. As noted earlier, however, an October 14, 1999 memo from Darwan to Defendant's drywall hangers and tapers stated that working hours were 7:00 a.m. to 3:30 p.m; Defendant does not explain how a standard eight-and-a-half hour day results in averages of fewer than 30 hours per week. (Def.'s Ex. 75.) Nor does Defendant offer any explanation for hiring so many tapers that they averaged fewer than 30 hours per week.

## VI.    Defendant's Remaining Challenges

Defendant raises a number of additional objections to the material audit and Plaintiffs' methodology, but the court finds none persuasive. First, Defendant observes that, in their response to Defendant's interrogatories, Plaintiffs acknowledged that (1) generally accepted accounting principles ("GAAP") are not applicable to fringe benefit audits, (2) the American Institute of Certified Public Accountants has not established standards for fringe benefit audits, and (3) fringe benefit audits are performed pursuant to agreed-upon procedures developed by Plaintiffs. (Def.'s Ex. 115 ¶ 21.) The court recognizes that determining hours worked on the basis of material used is not the standard method of auditing hourly reports, but Defendant does not indicate how these factors about fringe benefit audits generally call into question the LSS material audit's reliability. Second, Defendant notes that when Defendant's counsel asked Glenn Frederick, a business agent for PDC 14, whether he was aware of any violations by Defendant of the CBAs, he replied that he was not. (T.T., at 654-55, 660-61.) In the court's view, however, the fact that a PDC 14 representative was not aware of any such violations does not demonstrate that none existed. Third, Defendant points out that, based on two documents shown to Levinson at trial, he testified that in 1992 an LSS auditor used productivity rates of 3.7 and 4.5 boards per hour. (Id. at 529-31.) Defendant has not submitted these documents into the record, however, and the court declines to evaluate these unsubstantiated allegations.

Fourth, Defendant notes that Matthew Murphy, an In Charge Accountant for the accounting firm of Bansley and Kiener who conducted a material audit of Defendant for the PDC 30 pension funds covering the period January 1, 2000 through February 1, 2002, faxed a memo to Darwan on May 29, 2002 indicating that he would use a productivity rate of 3.77 boards per hour. (*Id.* at 1053-56; Def.'s Exs. 120-22.)[61] The court notes, however, that in a June 10, 2002 letter to Darwan, Thomas Caplice, the partner in charge of Bansley and Kiener's PDC 30 account, informed Darwan that the document that Murphy faxed to Darwan "was transcribed from a draft of a formula prepared by a predecessor auditor and it contained typographical errors and missing information." (T.T., at 1081-82; Def.'s Ex. 127, at 1.) Caplice claimed that the previous auditor for the PDC 30 funds had assumed a productivity rate of 2.86 boards per hour, which as noted above is the rate that Plaintiffs' auditor employed. (Def.'s Ex. 127, at 2.) Caplice added that "[w]hen our payroll compliance review is complete and our report issued, the formula applied by our office will be disclosed in our report." (*Id.* at 1.) Given that Caplice apparently never used the productivity figure Murphy initially mentioned to Darwan (3.77 boards per hour), the court declines to consider it.[62]

Finally, Defendant points out that Smith acknowledged that she did not ask Defendant whether any of its builders purchased drywall. (D.F. ¶ 277 (citing T.T., at 611).) Defendant does not indicate how this fact supports its contention that the material audit does not accurately reflect

---

[61]     Although Murphy could not recall with certainty who "came up with" this productivity figure, he believed it might have been a trustee of the PDC 30 funds. (T.T., at 1062.)

[62]     Defendant urges that Caplice's statement in his June 10 letter that Murphy's memo "contained typographical errors and missing information" contradicts Caplice's testimony that the trustees of the PDC 30 funds had not directed his firm to use any formula for a material audit. (D.F. ¶ 407 (citing T.T., at 1085).) The court notes, however, that Caplice testified that while his company had gathered information necessary to begin conducting the audit (he did not describe this information), his firm had not commenced the audit because the PDC 30 fund trustees had not yet told the firm what productivity rate to use. (T.T., at 1083-88.) Defendant also claims that Caplice "could not identify any typographical errors . . . with respect to the formula," (D.F. ¶ 408), but the court notes that Caplice testified that the phrase "typographical errors" referred to "the fact that this is not our formula[;] [w]e don't have a formula." (T.T., at 1090.)

the hours worked by its tapers. Indeed, the court assumes that if the material audits failed to account for drywall purchased by builders, but taped and finished by Defendant's workers, the discrepancy presumably redounded to Defendant's favor.

## DISCUSSION

### I.    Jurisdiction

Plaintiffs assert that this court has subject matter jurisdiction of this action pursuant to §§ 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, and § 301 of the LMRA, 29 U.S.C. § 185(a). (P.C. ¶ 2.) Under §§ 502(g)(2) and 515 of ERISA, a pension fund may bring suit to enforce written promises by employers to make contributions to pension funds on behalf of their employees without regard to understandings or defenses applicable to the employer and the union. *Laborers Health and Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 547 (1988); *Elec. Workers Pension Trust Fund of Local Union #58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378 (6th Cir. 2003); *Shaffer v. Veneman*, 325 F.3d 370, 372-73 (D.C. Cir. 2003); *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 771, 778 (7th Cir. 2002). Section 301 of the LMRA permits "[s]uits for violation of contracts between an employer and a labor organization representing employees . . . ." 29 U.S.C. § 185(a); *A & C Envtl.*, 301 F.3d at 771.

### II.    Liability

ERISA requires an employer to keep records of its employees' hours sufficient to permit the calculation of benefits. 29 U.S.C. § 1059(a)(1); *Ill. Conference of Teamsters & Employers Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1367 (7th Cir. 1995). At least some authorities hold that where a trust fund proves the employer is liable for delinquent contributions (here, an admitted fact), and the employer has failed to keep adequate records, the burden shifts to the employer to demonstrate that the fund's calculations are not accurate. *See Steve Gilbert*, 71 F.3d at 1367 (citing *Brick Masons Pension Trust v. Indus. Fence & Supply, Inc.*, 839 F.2d 1333, 1337-39 (9th

Cir.1988); *Combs v. King*, 764 F.2d 818, 825-27 (11th Cir.1985)). In the court's view, Defendant's records do not satisfy this requirement. As noted above, it is undisputed that in 1995 and 1996, Defendant calculated employees' compensation by converting the number of boards taped and finished by each crew in a week into budgeted hours and then dividing those hours among the tapers, rather than compensating them for hours worked. (D.F. ¶¶ 133, 135; T.T., at 222-25, 228, 230-32; Pls.' Ex. 50.) Notwithstanding Darwan's vigorous denials, it appears that Defendant continued this practice for tapers Sanchez and Moreno during the material audit period, with one change: when tapers worked fewer hours than Defendant had budgeted for a project, those hours were apparently recorded, and the remaining hours were "carried over" to the next week.[63]

At the very least, the court finds that the time sheets for Defendant's tapers are simply not credible, as 71 percent purport to show that tapers worked precisely the number of hours budgeted (80 and 78 percent of the time for Sanchez's and Moreno's crews, respectively). Defendant does not attempt to explain these coincidences; rather, it states in conclusory fashion that its time sheets satisfy ERISA's record-keeping requirements. (D.C. ¶¶ 7-8.) The court finds it highly unlikely that Defendant's work crews happened to meet the budgeted hours precisely on such a regular basis.

As the court finds Defendant's time sheets insufficient to permit a proper calculation of benefits, this court must endeavor to estimate how many hours Defendant's tapers actually worked during the material audit period. Defendant claims its tapers can tape more than 4 boards per hour, and notes that the tapers in the videotaped house taped and finished 4.25 boards per hour (including fire taping and double boarding). Although, as noted, Darwan claimed the house in the videotape was "a typical house," (T.T., at 802; Def.'s Ex. 70.5), Defendant offered no evidence that these rates were reflective of its *average* tapers. Indeed, it was in Defendant's best interest to submit a videotape showing its most efficient tapers on the job. Further, as noted, Defendant's own

---

[63]     Only one time sheet from the material audit period indicates that Sanchez's crew worked two hours more than were budgeted.

(flawed) records for all taping and finishing work during the material audit period report a productivity rate of only 3.74 boards per hour. (Pls.' Ex. 13, at 4.) From the court's perspective, as those records rarely show Defendant's tapers going over budget, it is likely that Defendant's workers taped and finished at a lower rate.

Plaintiffs' experts and the published sources in the record contain a wide range of estimates of average taper productivity. As noted above, Klomfar claimed that Service Decorating's employees taped and finished 2.62 boards per hour on average; Hull estimated that tapers can tape and finish 2.8 boards per hour; published estimates vary from 1.89 to 3.4 boards per hour; the material audit employed a productivity figure of 2.86 boards per hour. Despite Defendant's extensive attacks on these figures, it does not present a credible estimate of its own. Instead, it insists that its time sheets were accurate. Although Defendant acknowledges that the 3.74 boards per hour rate found by the Levinson audit reflects total materials purchased per hour worked that Defendant reported for the material audit period, Defendant implies that LSS should have excluded estimated fire taped drywall, double layers, and waste to obtain an accurate productivity figure. (D.F. ¶ 71.) As noted, employing such a method, Darwan determined that Defendant's records in fact report a production rate of only 2.63 boards per hour for boards that were taped and finished. (Def.'s Ex. 111; T.T., at 873-75.) The court notes that this rate is in fact well below the 4 boards per hour rate (excluding double layers) that Darwan boasted. (T.T., at 910-11.) Darwan acknowledged this discrepancy, but insisted that his tapers have performed more efficiently since the material audit period, stating "I'll be frank with you, [2.63 boards per hour] is not something I'm proud of because I know we're doing better. . . . [I]t only explains why [in] 1999 we didn't make money. I mean, [in] 2000 we did better and [in] 2001 we did even better." (*Id.* at 875.) Assuming Darwan is correct, and his tapers have improved steadily since the material audit period, then the fact that two of Defendant's workers taped 5.16 boards per hour overall (4.25 boards per hour excluding wasted boards) on a videotaped project, discussed above, is not indicative of how

38

efficient Defendant's tapers were during the material audit period (the court presumes that project was videotaped in preparation for trial and hence, after this case was filed on April 9, 2001). Further, from the court's perspective, if Defendant's tapers were in fact able to tape and finish in excess of 4 boards per hour, then one would expect that Defendant's budgets would reflect that rate, and that hours budgeted would not often equal hours worked. As noted, however, during the material audit period, hours recorded on the time sheets (71 percent of which were the same as hours budgeted) indicate an overall productivity rate of only 3.74 boards per hour. It seems likely, then, that Defendant did not believe during the material audit period that its tapers could tape well in excess of 4 boards per hour.

Defendant contends that Plaintiffs' material audit "is impermissible since it is not based upon hours actually worked by employees," but does not explain how the case it cites, *Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956 (7th Cir. 2001), supports this contention. (D.C. ¶ 17.) In *Mazzei*, the defendant, which provided trucking services to the construction industry, entered into a CBA with a labor union representing truck drivers who owned and operated their own trucks, whom the court concluded were independent contractors of defendant. *Id.* at 958, 965. The CBA required employers to contribute to pension funds on behalf of these owner-drivers, regardless of the number of hours worked. *Id.* at 960-62. The *Mazzei* court explained that for independent contractors (as opposed to employees), employers cannot be required to contribute to union pension funds unless such contributions are based on the number of hours worked. *Id.* at 965. The court therefore concluded that the CBA provision requiring defendant to pay contributions on behalf of independent contractors regardless of the number of hours worked ran afoul of the LMRA. *Id.* at 965-66. The court did not address whether pension funds may estimate the number of hours worked by employees in the absence of accurate records. Nothing in *Mazzei* establishes that a pension fund may not estimate the number of hours worked by covered employees where, as here, the fund cannot determine from the employer's records whether required contributions have been

39

fully paid.

Plaintiffs cite authority from other Courts of Appeals to support their contention that when an employer fails to keep records sufficient to permit the calculation of benefits under § 1059(a)(1), it bears the burden to show that the pension fund's material audit is inaccurate. *See Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 695-96 (6th Cir.1994); *Brick Masons*, 839 F.2d at 1337-39; *Combs*, 764 F.2d at 825-27. Our own Court of Appeals has explained, however, that "[o]nce a case comes to trial . . . the burden-shifting structure has served its function and falls away." *See Chicago Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 347 F.3d 262, 265 (7th Cir. 2003) (citations omitted).

Regardless which party bears the burden of proof in this case, the court concludes that the material audit productivity figure of 2.86 boards per hour reflects a conservative distillation of the estimates in the record. First, this figure is actually toward the high end of the credible estimates of average taper productivity for residential projects in the record (1.89, 2.31, 2.62, 2.77, 2.78, 2.8, 2.86, 3.4). Further, for the reasons already explained, this court has found that Defendant's tapers likely taped and finished far fewer than 3.74 boards per hour (the figure Defendant reported to Plaintiffs). The court finds therefore that LSS's material audit employed a plausible estimate of the number of hours Defendant's tapers worked during the material audit period. Further, in the court's view, ERISA policy supports this approach. If a multiemployer plan has no recourse when an employer's reported hours match the hours recorded on its time sheets, even if those sheets are deemed inaccurate, that employer is effectively rewarded for keeping slipshod (or even fraudulent) records. To determine the damages in this case, therefore, the court looks to that material audit.

## III. Damages

As noted above, it is undisputed that Defendant owes Plaintiffs $1,900.52 in benefits based on "payroll and cash disbursements." (Pls.' Ex. 20; P.F. ¶¶ 110, 141; T.T., at 986-87.) The

material audit indicates that Defendant owes an additional $51,641.25 to the Pension Fund, $6,885.50 to the Savings Fund, and $54,395.45 to the Welfare Fund. (Pls.' Ex. 12, at 2.) The audit also suggests that Defendant owes smaller amounts to other funds or accounts: $688.55 to "Cooperation," $3,580.46 to "CDFAF," $413.13 to "CDFIAF," and $137.71 to the Scholarship Fund. (Id.) Defendant notes that the latter four funds are not parties to this action, and claims therefore that it is not deficient as to these amounts; Plaintiffs do not address this contention. (D.C. ¶¶ 5-6.) The material audit report also indicates that Defendant owes $1,063.96 for work performed in PDC 30's jurisdiction and $836.56 in PDC 33's jurisdiction. (Pls.' Ex. 12, at 2; D.F. ¶¶ 257-60.) Defendant claims it is not liable to PDC 14 for funds assertedly owed to other District Councils; Plaintiffs do not address these amounts. (D.F. ¶ 60.)[64] Plaintiffs also claim that the LSS audit shows that Defendant owes $23,875.50 "in unpaid liquidated damages for work months from September[] 1998 through July[] 2000." (P.F. ¶ 143.) In his deposition, Darwan acknowledged that the audit indicated that Defendant owed $23,000 in liquidated damages, but claimed that he did not know if that figure was accurate. (T.T., at 985-86.) This amount does not appear on the audit submitted into the record.

Plaintiffs also ask this court to award them interest, audit costs, reasonable attorney's fees,

---

[64]     Defendant claims that its CBAs with PDC 14 and with PDC 30 require employers to pay contributions to the DuPage County Painters' Trust Funds for work performed in the PDC 30 geographical region, and to Plaintiffs for work performed in the PDC 14 region. (D.C. ¶ 18-19.) Defendant contends that Plaintiffs "cannot seek contributions for hours worked in DuPage County . . . in the geographic jurisdiction of PDC 30," and therefore that Plaintiffs' "oral reciprocal transfer agreement rules violate" ERISA standards governing transfers of assets from one multi-employer plan to another, ERISA § 4234, 29 U.S.C. § 1414. (Id. ¶¶ 20-21.)

Defendant's CBA with PDC 30 is not in the record, and Defendant does not cite any particular provisions of the PDC 14 CBAs, provide evidence that Plaintiff is relying on an "oral reciprocal transfer agreement," or otherwise explain how Plaintiffs' suit violates § 4234. The court notes that the PDC 14 CBAs require that Defendant, when its workers are employed outside the PDC 14 region, comply with the CBA in effect in that region, including provisions governing payment of fringe benefits. (CBAs art. III § 7.) As discussed below, the parties will have the opportunity to address the calculation of Plaintiffs' damages claims, including those relating to work performed in the PDC 30 region, within 21 days of this order.

41

and court costs pursuant to 29 U.S.C. § 1132(g)(2). (P.F. ¶¶ 140, 146-47; P.C. ¶¶ 95-96, 99(g).) Where, as here, a plan fiduciary prevails in a suit to collect delinquent contributions under § 515 of ERISA, the court must award the fund (1) reasonable attorney's fees and costs, (2) interest on the unpaid contributions at the interest rate "provided under the plan," and (3) an amount equal to the greater of that interest or "liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the [unpaid contributions]." 29 U.S.C. § 1132(g)(2); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 608 (7th Cir. 2002) (citation omitted); *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corp.*, 258 F.3d 645, 652 (7th Cir. 2001).

As noted above, the CBAs provide that if an audit determines that Defendant has underpaid contributions and/or wages, Defendant is liable for audit fees, attorney's fees, and collection costs. (Pls.' Exs. 3-5, arts. VI-VIII § 3(b)-(c).) The agreements also provide that when Defendant does not make contributions by the 20th day of the month after work was performed, Plaintiffs may assess liquidated damages of ten percent of the amount owed "to defer administrative costs." (*Id.* arts. VI-VII § 1(c).) On the other hand, the Declaration of Trust provides that for any unpaid contributions, Defendant is liable for liquidated damages of the greater of $50 or 1 ½ percent per month that the contributions remain unpaid plus reasonable attorney's fees and costs, including court fees and audit fees. (Pls.' Exs. 6-8 art. IV § 4.) The parties do not address which of these liquidated damage formulas the court should employ in this case.

In addition, Plaintiffs seek an "equitable accounting" to determine whether Defendant owes additional sums for the period October 1, 1998 through September 30, 1999, as well as other equitable relief pursuant to 29 U.S.C. § 1132(g)(2)(E). (P.C. ¶ 99(h).) A court may order an equitable accounting when "the computation of damages involves complexities that would baffle a jury." *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 577 (7th Cir. 2004) (citing *Kirby v. Lake Shore & Michigan Southern R.R.*, 120 U.S. 130, 134 (1887)). Defendant has not addressed

whether the court should award Plaintiffs an equitable accounting, nor have Plaintiffs proposed a method for conducting such an accounting.

In the court's view, neither party adequately addresses the various sums at issue, including those set forth in the material audit, the $23,875.50 amount that does not appear in the record before this court, interest on unpaid contributions, and liquidated damages (or interest, whichever is greater), or whether Plaintiffs are entitled to the requested equitable accounting. For this reason, the court will give the parties the opportunity to submit briefs limited to the proper calculation of damages. Specifically, the court suggests that the parties submit a proposed agreed calculation of damages within 21 days of this order, using a figure of 2.86 boards per hour during the material audit period. Defendant's agreement to these calculations will be without prejudice to its appeal rights. The parties should also address any other outstanding claims, including interest, liquidated damages, and the $23,875.50 in unpaid liquidated damages for the period September 1998 through July 2000. (The parties need not address costs or attorney's fees, which are determined after judgment is entered.) If, despite their best efforts, the parties are unable to reach agreement within 21 days, each party is directed to submit its own proposal. In addition, the parties are directed to submit briefs limited to Plaintiffs' claim for an equitable accounting for the period October 1, 1998 through September 30, 1999.

### CONCLUSION

The court finds in favor of Plaintiffs, but grants the parties 21 days to file an agreed-upon calculation of damages, if possible. If they are unable to stipulate to the relevant figures, the parties are invited to submit separate proposals within 21 days.

ENTER:

Dated: June 29, 2004

REBECCA R. PALLMEYER
United States District Judge

43