# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2458 | **DATE** | 11/19/2004 |
| **CASE TITLE** | Trustees of The Chicago Painters vs. Salma Darwan, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10)■ [Other docket entry] Enter Memorandum Opinion And Order. The court hereby awards Plaintiffs $30,508.13 in unpaid contributions from October 1, 1999 through March 31, 2000 and $68,266.16 in liquidated damages accrued during this period. The court also awards Plaintiffs $17,955.82 in accumulated liquidated damages arising from late contributions to the Funds for the period December 1, 1998 through March 31, 2000 and $712.08 in owed payroll and cash disbursements. Finally, the court orders Defendant to open its records to a further audit of its payroll and materials records for the period from December 1, 1998 through September 30, 1999. Status conference for determination of the results of audit set for 12/16/04 at 9:00.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | Document Number |
| | No notices required. | | NOV 22 2004 date docketed | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | rbf docketing deputy initials | 90 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | | 11/19/2004 | |
| | ETV | courtroom deputy's initials | 2004 NOV 19 PM 3:59 Date/time received in central Clerk's Office | date mailed notice ETV mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TRUSTEES OF THE CHICAGO PAINTERS )
AND DECORATORS PENSION, HEALTH )
AND WELFARE AND DEFERRED SAVINGS )
PLAN TRUST FUNDS, )
)
        Plaintiffs, )
)
v. ) No. 01 C 2458
)
SALMA DARWAN d/b/a ROYAL, ) Judge Rebecca R. Pallmeyer
INTERNATIONAL & DECORATING, INC., a )
putative corporation n/k/a ROYAL )
INTERNATIONAL DRYWALL & )
DECORATING, INC., an Illinois corporation, )
)
        Defendant. )

DOCKETED

NOV 2 2 2004

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Trustees of the Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Savings Plan Trust Funds, brought this action for unpaid contributions against Defendant Salma Darwan, d/b/a Royal International & Decorating, Inc., n/k/a Royal International Drywall & Decorating, Inc. Plaintiffs claim Defendant under-reported the number of hours its employees worked taping and finishing drywall in Cook County residential construction projects. The complaint, brought under section 301 of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. § 185(a), and §§ 502 and 515 of the Employee Retirement Security Act of 1974, as amended, 29 U.S.C. §§ 1132 and 1145, seeks an order requiring Defendants to make the appropriate contributions, as well as an award of interest, fees, costs, liquidated damages, and an equitable accounting.

Plaintiffs presented a novel theory: They argue that the court should disregard Defendant's payroll records as inaccurate and instead calculate the number of hours worked based on the amount of raw material Darwan used throughout the period. Following an eight-day bench trial, the court adopted this theory and found in favor of the Plaintiffs. *Trustees of the Chicago Painters*

*and Decorators Pension v. Darwan*, No. 01-C-2458, 2004 WL 1459553 (N.D. Ill., June 29, 2004) Specifically, the court concluded that Defendant's records were incomplete and unreliable, and that Plaintiffs had adequately established that use of a formula would permit a more accurate determination of the number of hours worked by Defendant's employees. Because the court was nevertheless unable to determine the appropriate award from materials in the record, the court stayed entry of judgment in order to give the parties the opportunity to submit briefs specifically addressing the proper calculation of damages. The parties have since submitted such briefs, and the matter is before the court for ruling.

## **FACTUAL BACKGROUND** [1]

Plaintiffs' suit arose out of a series of collective bargaining agreements ("CBAs") between Defendant Royal and the Painter's District Council No. 14 ("PDC 14"), the Chicago affiliate of the International Brotherhood of Painters and Allied Trades, and the Agreement and Declaration of Trust establishing the Plaintiff Funds (the "Declaration") (together with the CBAs, the "Agreements"). Plaintiffs claimed that Defendant breached the Agreements during the period October 1, 1998 through March 31, 2000 by failing to report and contribute the required pension amounts for some of the hours worked by Union employees on drywall taping and finishing work. Defendant claimed that its records accurately reflected the number of hours worked by the covered employees and that its corresponding fund contributions fulfilled its obligations under the Agreements.

Defendant Royal's business involves drywall installing, taping, and painting for residential tract housing projects. The evidence showed that, at least through March 31, 2000, Defendant paid its employees on a piecework basis, with each employee receiving a set dollar amount for

---

[1] The facts of this matter are more fully presented in this court's June 29, 2004 Memorandum Opinion and Order ("Order"). *See Darwan*, 2004 WL 1459553 (N.D. Ill.), at *1-17. This opinion assumes the reader's familiarity with the earlier decision and will summarize the relevant facts adduced at trial.

each piece of drywall taped and installed, rather than for the actual hours worked as required by the CBAs. In addition, as described more fully in the court's earlier opinion, there was evidence that the records Defendant submitted, purporting to reflect the actual number of hours worked by its employees, were unreliable.[2] In the absence of accurate records, Plaintiffs proposed that Defendant's contributions to the fund be calculated by establishing an average productivity rate (i.e. number of boards taped and installed per hour) and dividing the total number of boards installed by Defendant's covered employees by that figure.[3] The estimate, Plaintiffs argued, would provide a more accurate statement of the total hours actually worked by Plaintiffs' employees and, hence, contributions owed to the Funds by Defendant. The parties submitted a number of productivity estimates, based on expert testimony, industry manuals, and even a videotaped installation.[4] The estimates ranged from 1.89 to 4.25 boards per hour; and for the reasons explained in its earlier opinion, the court ultimately settled on an average productivity estimate of 2.86 boards per hour as proper.

## DISCUSSION

After finding that Defendant's payroll records were inaccurate, the court observed that neither party had adequately addressed the issue of damages. *Darwan*, 2004 WL 1459553 (N.D. Ill.), at *20. The court asked the parties to submit briefs on the damage issues, using the 2.86

---

[2] In place of accurate record keeping of actual hours worked, Defendant Royal instead appears to have, on at least some occasions, adjusted time sheets to fit a predetermined budget. Specifically, Defendant would budget a certain amount of hours to labor costs for a given week and divide the number of hours budgeted by the number of workers. Because the workers themselves were paid on a piecework basis, in some instances the time sheets underreported the amount of hours its employees actually worked. *See Darwan*, 2004 WL 1459553 (N.D. Ill.), at *3-5.

[3] Plaintiffs conducted a "material audit" to compare Defendant's reported taper hours to the drywall materials purchased during the period October 1, 1999 through March 31, 2000 (the "material audit period"). *See Darwan*, 2004 WL 1459553 (N.D. Ill.), at *13-15.

[4] Although Defendant submitted its own productivity estimates, at no point did it explicitly argue that such estimates would confirm the accuracy of its hourly records.

boards per hour rate, and also addressing the issue of interest, liquidated damages, and damages outside of the material audit period. Although, in the court's view, neither party adequately addresses these issues in their supplemental briefs, the court recognizes that three matters are in dispute: (1) the amount of unpaid contributions Defendant owed to the Pension, Welfare and Savings Funds during the material audit period of October 1, 1999 through March 31, 2000; (2) whether Plaintiffs are entitled to an equitable accounting for the period from October 1, 1998 through September 30, 1999 pursuant to 29 U.S.C. § 1132(g)(2)(E); and (3) whether an award of liquidated damages is warranted and, if so, the proper measure of those damages. The court will address these issues in turn.

I.      **Calculation of Unpaid Contributions During Material Audit Period**

In support of its claims that Defendant Royal's payroll records and Fund contributions did not accurately reflect the number of hours worked by covered employees, Plaintiffs conducted a "material audit" to compare Defendant's reported taper hours to the amount of drywall materials Defendant had purchased between October 1, 1999 through March 31, 2000. (Pls.' Ex. 12, at 2.) In the material audit, certified public accountants compared invoices showing the number of boards shipped to Defendant with the number of hours recorded on the time sheets during the material audit period. During this period, Defendant had reported that its taping employees worked 44,582.5 hours while taping 166,890 boards (an average of 3.74 boards per hour). (Pls.' Ex. 13, at 4; Pls.' Ex. 20.) Using the more accurate 2.86 boards per hour rate, Plaintiffs calculated that Defendant should have reported 58,353.12 hours. Defendant thus underreported 13,770.62 hours during the material audit period. Applying the contribution rates set forth in the CBAs, the audit concluded that Defendant owes $51,641.25 to the Pension Fund, $6,885.50 to the Savings Fund,

and $54,395.45 to the Welfare Fund - a total of $112,922.20. (Pls.' Ex. 12, at 2.)[5]

In its June 29, 2004 opinion, the court accepted the 2.86 boards per hour rate as a conservative estimate of average taper productivity. *Darwan*, 2004 WL 1459553 (N.D. Ill.), at *19. The court also found that the material audit conducted by Plaintiffs provided a "plausible estimate" of the number of hours actually worked by Defendant's employees during the audit period (October 1, 1999 through March 31, 2000). (*Id.*) In its supplemental brief, Plaintiffs rely entirely on the material audit figures in order to calculate the unpaid contributions during this period. (Pls.' Mem., at 2-3.) Defendant, however, objects to the material audit's calculation of unpaid contributions on the grounds that the audit does not take into account the amount of work performed outside of the geographic jurisdiction of PDC 14, for which, according to Defendant, the Funds cannot recover. (Def.'s Mem., at 3.) Defendant also asserts that the audit failed to include a number of tapers who were employed by Defendant during the audit period. (*Id.* at 3.) The court addresses these objections below.

### A. Contributions for Hours Worked Outside of the Geographic Jurisdiction of PDC 14

Defendant argues that the records permit a determination of the projection of hours its workers were employed at jobs within the jurisdiction, and that it is liable to make contributions for those hours only. Plaintiffs challenge this position, but as explained here, the court concludes Defendant is correct.

#### 1. Records Reflecting Proportion of Hours Worked in the Jurisdiction

Defendant contends its records show it conducted an average of only 36% of its business

---

[5] The audit also revealed that Defendant owes smaller amounts to other funds: $688.55 to "Cooperation," $3,580.46 to "CDFAF," $413.13 to "CDFIAF," and $137.71 to the Scholarship Fund. (*Id.*) Defendant correctly notes, and Plaintiffs do not dispute, that these other funds are not party to the suit and therefore cannot recover here. (Defendant's Memorandum in Support of Its Proposed Damage Calculations ("Def.'s Mem.") at 2; Plaintiffs' Memorandum Regarding Calculation of Damages ("Pls.' Mem.") at 2.)

within the jurisdiction of PDC 14.[6] (Def.'s Mem., at 4; Ex. B to Def.'s Mem.) The remaining 64% of the work performed during the audit period, according to Defendant, took place in DuPage County, within the geographic jurisdiction of Painter's District Council No. 30 ("PDC 30"). (*Id.*) Defendant asserts that any contributions for hours performed in DuPage County are owed to PDC 30, as Plaintiffs' Fund Administrator himself admitted during his trial testimony. (Def.'s Mem., at 4 (citing T.T., 1026).)

Plaintiffs contend that the Funds are entitled to recover for work performed in counties outside of the geographic jurisdiction of PDC 14. They point out that pursuant to the Declaration Defendant has a duty to contribute to the Funds regardless of the geographic location of the work unless it made payment to an applicable fund in the geographic location where the work was performed. (Pls.' Mem., at 3 (citing Pl. Ex. 4, Art. VI-VIII § 1(d)).) They note, further, that Defendant has not presented evidence that would enable the court to determine the number of hours worked outside of PDC 14's jurisdiction. (Pls.' Mem., at 3.)

Plaintiffs' argument appears to reflect a misunderstanding of the court's discussion of the burden of proof issue in its June 29, 2004 Order. As the court explained there, ERISA imposes on an employer the duty to maintain records of its employees' hours sufficient to permit the calculation of benefits. 29 U.S.C. § 1059(a)(1); *Illinois Conference of Teamsters & Employers Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1367 (7th Cir. 1995). In its opinion, the court noted that some authorities have held that where an employer is liable for unpaid or delinquent contributions, and the employer has failed to keep adequate records, the burden shifts to the employer to demonstrate that the fund's calculations are inaccurate. *Darwan*, 2004 WL 1459553 (N.D. Ill.), at *17, (citing *Steve Gilbert*, 71 F.3d at 1367).

Following these authorities, the court concluded that, in the absence of adequate employer

---

[6] The parties and their exhibits occasional refer to Local 33, which is an affiliated local within the jurisdiction of PDC 14. (Pls.' Mem., at 9; Def.'s Mem., at 4.)

6

records, the burden shifts to the employer to present evidence that a fund's contribution estimates are not accurate. As Defendant correctly notes, however, the fact that certain records are inadequate does not relieve the Plaintiff Funds from showing that its estimates are accurate in those areas where adequate records do exist. (Def.'s Mem., at 4.) Specifically, Defendant presents records that it claims are adequate to determine the amount of work performed within the geographic jurisdiction of PDC 14 during the audit period. (Ex. 110A to Def.'s Mem.) Exhibit 110A purports to set out the number of hours worked during each month of the material audit period by workers in PDC 30, PDC 30, and Local 33. As the court understands its position, Defendant contends that, despite the inaccuracy of its payroll records (due to underreporting of hours actually worked), those records are sufficient to determine the *percentage* of work covered by PDC 14 and, correspondingly, the percentage of work performed within the jurisdiction of PDC 30. Defendant notes that these records were available to Plaintiffs' auditors. (*Id.*)

In *Laborers' Pension Fund v. A & C Environmental, Inc.*, 301 F.3d 768, 782-83 (7th Cir. 2002), the Seventh Circuit held that where an employer's records are adequate to determine the amount of covered work performed by a plaintiff pension fund's members, the burden shifting rule does not apply. *Laborers' Pension Fund* was an action under ERISA to recover delinquent contributions and union dues alleged owed by an employer. To determine the amount of unpaid pension contributions, the plaintiff fund conducted an audit of defendant's payroll records, which proved to be adequate to determine the precise number of hours of covered work its employees performed, though inadequate in other ways. *Id.* at 773. Despite these inadequacies, the court held that the burden shifting rule did not apply because the records were adequate to determine the amount of covered work and, in that case, the entirety of the contribution award sought by the plaintiff funds was based on what the auditor determined to be covered work. *Id.* at 783.

Plaintiffs do not respond to Defendant's argument, nor do they cite any authority for the proposition that the burden should be entirely shifted to the Defendant to refute the material audit's

conclusions regarding unpaid contributions, even where the employer's records are adequate to determine the percentage of work performed within the geographic jurisdiction of PDC 14. In the court's view, Defendant's failure to keep adequate payroll records does not exempt Plaintiffs from considering these records that do exist. With respect to those record that permit a determination of the proportion of hours worked within the geographic jurisdiction of PDC 14, as opposed to within the jurisdiction of PDC 30, the burden remains on Plaintiffs to prove that the Funds suffered damages in the form of unpaid or delinquent contributions.

### 2. Defendant's Liability for Hours Worked Outside the Jurisdiction

Even if the records do permit a determination of the proportion of hours worked within the jurisdiction, Plaintiffs argue that the court should disregard this because the CBAs expressly requires Defendant to make contributions to the Funds even when its employees were working outside of the geographic jurisdiction of PDC 14. In support of this position, Plaintiffs note that the CBAs name PDC 14 as "the exclusive bargaining representative for and on behalf of all . . . who are employed by such Employer wherever and whenever employed." (Pls.' Ex. 3-5 art. III § 7.) The CBAs provide, further, that while working outside of the geographical jurisdiction of the Union, the employer must "comply with all of the lawful clauses" of the CBA or of any lawful collective bargaining agreement in effect in the outside jurisdiction:

> And provided further that the Employer when engaged in work outside the geographical jurisdiction of the Union party to the Agreement shall comply with all of the lawful clauses of the collective bargaining agreement in effect in said or other geographical jurisdiction and executed by the Employers of the industry and the local Unions in that jurisdiction, including, but not limited to, the provisions of wages, hours, working conditions and all fringe benefits therein provided . . .

(Id.) Defendant's obligation to contribute to the Funds for work completed outside of the geographic jurisdiction of PDC 14 is also clearly established in the CBAs, which state: "The contributions set forth above shall be made to the Welfare Fund for each hour worked by each Employee covered by this Agreement, regardless of the geographic location of the job, unless

8

payment was made to an applicable fund in the geographic area where the work was performed. In no case shall double payment be required." (*Id.* art. VI § 1(d).)

Defendant acknowledges that the CBAs require employers to contribute to the Funds for each hour worked by PDC 14 members, regardless of the location of their work. As Defendant notes, however, nothing in the provisions cited by Plaintiffs establishes that PDC 14 has standing to represent members of PDC 30. (Def.'s Mem., at 5.) Nor do the CBAs authorize PDC 14 to collect fund contributions for work completed by non-members. Plaintiffs have offered no evidence to rebut Defendant's showing that 64% of the hours worked during the material audit period were completed by members of PDC 30 (as opposed to members of PDC 14 working within the geographic jurisdiction of PDC 30). (Def.'s Mem., at 4; Ex. 110A to Def.'s Mem.) Instead, Plaintiffs merely rely on the burden-shifting argument discussed above, arguing that Defendant did not meet its burden to refute the audit figures by failing to provide a "job-by-job, man-by-man breakdown of hours owed." (Pls.' Mem., at 4.) Such reliance is misplaced. The burden-shifting rationale, where it has been adopted, is reserved for those situations in which the employer, through sloppy record keeping, has prevented plaintiffs from putting forward concrete evidence of damages. *See Steve Gilbert*, 71 F.3d at 1367 (citing *Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.*, 839 F.2d 1333, 1337-39 (9th Cir. 1988); *Combs v. King*, 764 F.2d 818, 825-27 (11th Cir. 1985)). Here on the other hand, as Defendant correctly notes, Plaintiffs surely know the identity of their own workers and could have specified those persons in the audit and sought benefits on their behalf. (Def.'s Mem., at 6.) Having failed to do so, Plaintiffs leave the court no choice other than to accept Defendant's proposed reduction to the material audit figure.[7]

---

[7] It is not clear to the court why Plaintiffs failed to invite PDC 30 to join its suit against Defendant. Whatever the reason, having failed to do Plaintiffs lack standing to represent that local's members or to collect any unpaid contributions on behalf of its members. If indeed, as seems likely, Defendant has failed to fully contribute to the relevant pension funds of its employees, PDC 30 is free to bring its own suit against Defendant to collect those sums.

### B. Employees Excluded From Audit Calculations

Defendant also asserts that Plaintiffs' audit inadvertently excluded a number of PDC 14's tapers. (Def.'s Mem., at 3.) Plaintiffs' auditor admitted that Defendant had provided her with a list of tapers that had been excluded from the audit. (T.T. 624.) Defendant has also submitted such a list to the court in its supplemental brief, together with a breakdown of the number of hours worked in each month during the material audit period by these excluded workers. (Ex. E to Def.'s Mem.) Again, Plaintiffs fail to respond to Defendant's contentions, simply stating that "Defendant failed to carry its burden of proof by not presenting any evidence as to itemization of any offset." (Pls.' Mem., at 3.) Again, absent any direct response, the court will accept Defendant's reductions based on tapers excluded from the material audit.

As set forth below, the court has calculated the award due to Plaintiffs for unpaid contributions during the material audit period as $30,508.13. This calculation utilizes the 2.86 boards per hour rate. It includes those reported hours that had been excluded by the audit and takes into account the percentage of audited hours worked by non-members of PDC 14 as discussed above.

| Month | # of Boards (Pls.' Ex. 13) | Actual Hours worked (2.86 boards per hour) | Hours Reported (Def.'s Ex. 110A) | Over (Under) Reported Hours | Contribution Rates[8] (Pls.' Ex. 12) | % of PDC 14 Workers (Def.'s Ex. 110A) | Total Unpaid Contributions Owed to PDC 14 Funds |
|---|---|---|---|---|---|---|---|
| Oct. 1999 | 41,000.67 | 14,335.90 | 9,597.50 | 4,738.40 | $38,854.88 | 35.3582% | $13,738.39 |
| Nov. 1999 | 34,705.52 | 12,134.80 | 9,104.25 | 3,030.55 | $24,850.51 | 36.2358% | $9,004.78 |
| Dec. 1999 | 18,051.31 | 6,311.65 | 7,649.50 | (1,337.85) | (10,970.37) | 43.6499% | ($4,788.56) |

---

[8] The contribution rates for each hour worked total $8.20 and breakdown as follows into the separate Funds: Pension- $3.75; Welfare $3.95; Savings $0.50.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Jan. 2000 | 21,346.00 | 7,463.64 | 5,415.00 | 2,048.64 | $16,798.85 | 37.9409% | $6,373.63 |
| Feb. 2000 | 23,831.96 | 8,332.85 | 7,010.25 | 1,322.60 | $10,845.32 | 35.6942% | $3,871.15 |
| Mar. 2000 | 27,954.46 | 9,774.29 | 9,329.50 | 444.79 | $ 3,647.28 | 30.8484% | $1,125.13 |
| Totals | 166,889.92 | 58,353.13 | 48,106.00 | 10,247.12 | $84,026.38 | 36.3078% | $30,508.13 |

## II. Equitable Accounting From October 1, 1998 Through September 30, 1999

The second issue before the court is Plaintiffs' request for an equitable accounting for the period from October 1998 through September 1999. As discussed above, Plaintiffs' material audit focused on the six-month period from October 1999 through March 2000. In this lawsuit, Plaintiffs seek recovery for unpaid contributions over a broader period, from October 1, 1998 through March 31, 2000. In addition to the sums determined pursuant to the audit, Plaintiffs also urge the court to order an equitable accounting pursuant to 29 U.S.C. § 1132(g)(2)(E) to determine the damages owed for this additional period not considered in the audit.

Defendant did not discuss Plaintiffs' request for an equitable accounting in its supplemental brief on damages. The court therefore presumes that Defendant does not object to the proposed audit. Defendant does raise an objection to any award of damages arising prior to November 30, 1998, a period for which Plaintiffs released all claims against Defendant in a prior lawsuit. (Ex. D to Def.'s Mem., ¶¶ 3, 4, 7.) Plaintiffs do not address this prior settlement and the court therefore presumes they concede that their right to recovery of sums up to that date is barred by the previous agreement.

The court concludes that an equitable accounting is appropriate for the period December 1, 1998 through September 30, 1999. Defendant is directed promptly to produce invoices for all drywall purchases during this period as well as copies of all fringe benefit reports paid to PDC 30 benefit funds. The total number of hours worked during this period will be calculated using the

established 2.86 boards per hour productivity rate. This total shall be compared to the number of hours for which Defendant contributed during that period to establish the total underpaid hours. Damages will then be assessed for these underpaid hours based on the applicable fringe benefit fund rate for the welfare, pension, and savings funds. After the audit data is collected, the court encourages the party to exchange this information and attempt to reach an agreement as to the appropriate damage calculations, following the procedure outlined above.

### III. Liquidated Damages and Interest For Unpaid Contributions During the Material Audit Period

The final matter before the court is Plaintiffs' claim for liquidated damages, reasonable attorney's fees, and court costs. Under § 1132(g)(2) of ERISA, where a plan fiduciary prevails in a suit to collect delinquent contributions under § 515, the court must award the fund (1) reasonable attorney's fees and costs, (2) interest on the unpaid contributions at the interest rate "provided under the plan," and (3) an amount equal to the greater of interest on the unpaid contributions or liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the [unpaid contributions]." 29 U.S.C. § 1132(g)(2); *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 652 (7th Cir. 2001). Citing this statute, Plaintiffs seek an award of double interest on the late contributions documented during the material audit period. Defendant objects to this amount, claiming that the CBAs cap liquidated damage awards at 20% of the total unpaid contributions.

Unfortunately, the CBAs and Declaration contain inconsistent liquidated damages provisions. Under the Agreements, Defendant agreed to make contributions to the Funds "for each hour worked by each employee covered by this Agreement in addition to the wages." (Pls.' Exs. 3-5 arts. VI-VII § 1(a)(i).) Failure by the Defendant to furnish reports and make the required contributions by the twentieth day of the month after the work is performed entitles Plaintiffs, under

the Agreements, to assess liquidated damages. The CBAs provide that the Funds are entitled to liquidated damages to defer the administrative costs incurred by delinquent contributions totaling a minimum of 10%. (Pls.' Exs. 3-5 arts. VI-VII § 1(c).) In addition, late contributions bear interest at the prime rate. (*Id.*) The CBAs also declare that "the aggregate of liquidated damages and interest shall not exceed Twenty (20) percent unless by resolution of the Joint Board of Trustees." (*Id.*) The Declaration, on the other hand, states that any employer failing to make timely contributions shall be liable for liquidated damages of "$50.00 for each delinquency or liquidated damages in the amount of 1-½% per month on the whole amount of contributions remaining from time to time unpaid whichever is greater." (Pls.' Ex. 6-7 art. IV § 4.) The Declaration sets no cap on the final liquidated damages award.

Plaintiffs maintain that ERISA entitles them to the payment of interest on all unpaid contributions as well as either interest (i.e. double interest) or liquidated damages provided under the plan (in this case, 10%). (Pls.' Mem., at 6-7 (citing 29 U.S.C. §§ 1132(g)(2)(B), 1132(g)(c)(i).) Under section 1132(g)(2), "interest on unpaid contributions shall be determined by using the rate provided under the plan." (*Id.*) Understandably, Plaintiffs have chosen to seek double interest calculated based on the 1.5% monthly interest figure found in the Declaration, rather than interest at the prime rate as called for in the CBAs. Defendant contends, instead, that the CBAs' provision for interest at the prime rate should be applied.

It is clear that the CBAs and Declaration contain inconsistent provisions regarding the interest to be applied on unpaid contributions. What is not clear is which of the two provisions control in the event of an inconsistency. Here, where the drafters of the documents have failed to address the matter, the court must chose the rate. Good justifications exist for holding that either a collective bargaining agreement or pension trust agreement should control in the event of an inconsistency: The trust agreement, it could be said, was created specifically to govern the functioning of the pension funds, and therefore should take precedence in matters involving the

funds. On the other hand, one could argue that without the collective bargaining agreement, the pension trust would not even exist.

In arguing for the rate as set forth in the CBA, Defendant makes two points: (1) that the trust agreements do not contain a provision for rate of interest on unpaid contributions and (2) that Plaintiffs' interest calculations are unconscionable and unreasonable. (Def.'s Mem., at 7-8.) Defendant's first assertion is clearly incorrect. The Declaration does expressly provide for liquidated damages in the amount of the greater of $50.00 or 1.5% interest per month. (Pls.' Ex. 6-7 art. IV § 4.) In *Operating Engineers Local 139 v. Gustafson*, 258 F.3d 645 (7th Cir. 2001), the Seventh Circuit held that ERISA allows plans to choose between liquidated damages (plus interest) and double interest. *Gustafson*, 258 F.3d at 654. There, the court held that a similarly situated fund "was entitled to choose between double interest . . . and single interest plus liquidated damages . . . and, naturally, it chose the latter (higher) combination, as was its right." (*Id.*) In the absence of clarifying language in either the CBAs or Declaration, this court, similarly, will allow Plaintiffs to choose which provision to apply.

Defendant's unconscionability objection, however, has merit. Although the lone case cited in support of the assertion that Plaintiffs' interest calculations are "unconscionable and unreasonable" is one in which the court upheld an interest rate of 1.5% per month, in that case the interest amounted to an 18% annual rate. *Chicago Dist. Council of Carpenters Pension Fund v. Industrial Erectors, Inc.*, 840 F.Supp. 1248, 1255 (N.D. Ill. 1993). Plaintiffs' calculations here employ a daily compounding of the 1.5% monthly interest rate. (Ex. 6 to Pls.' Mem.) Despite the punitive nature of section 1132's double interest provision, a natural reading of the Declaration's liquidated damages language does not suggest that interest should be compounded daily. *See Operating Engineers Local 139 v. Gustafson*, 258 F.3d 645 (7th Cir. 2001) ("section 1132(g)(2) is a penalty statute rather than a statute merely regulating contract damages."); *Industrial Electors*, 840 F.Supp. at 1255 (interpreting a liquidated damage term of 1.5% interest per month to amount

14

to an 18% annual interest rate). As Defendant notes, under Plaintiffs' calculations in which interest compounds daily, the interest constitutes more than thirty percent of the unpaid contributions. Doubling that under § 1132(g)(2)(c) provides liquidated damages that represented 61% of the total value of the unpaid contributions. A much more natural reading of the Declaration provision would allow interest to compound monthly.

Plaintiffs are entitled to liquidated damages based on unpaid contributions during the material audit period (October 1, 1999 through March 31, 2000). Under § 1132(g)(2), Plaintiffs are entitled to double interest, which under the Declaration is set at 1.5% per month. Therefore, the court awards liquidated damages for the unpaid contributions during the period October 1, 1999 through March 31, 2000, based on an 1.5% monthly interest rate, doubled as pursuant to § 1132(g)(2)(c)(ii). Interest shall be compounded monthly. Calculated through October 2004, the liquidated damages for unpaid contributions during the material audit period totals $68,266.16. The Court hereby awards Plaintiffs this amount.

| Months | Unpaid Contributions | Interest (1.5% per month, compounded monthly) | Total Liquidated Damages (double interest) |
| --- | --- | --- | --- |
| October 1999 | $13,738.39 | $14,335.71 | $28,671.42 |
| November 1999 | $ 9,004.78 | $ 9,124.36 | $18,248.72 |
| December 1999 | $0 | $0 | $0 |
| January 2000 | $ 6,373.63 | $ 6,081.80 | $12,163.60 |
| February 2000 | $ 3,871.15 | $ 3,582.10 | $ 7,164.20 |
| March 2000 | $ 1,125.13 | $1,009.11 | $ 2,018.22 |
| Total | $30,508.13 | $34,133.08 | $68,266.16 |

IV. **Accumulated Liquidated Damages**

As noted, the CBAs provide for the assignment of liquidated damages in the event that

contributions to the Funds are received after the twentieth day of the month after the month the work was performed. (Pls.' Ex. 4, art. VI-VII § 1(c).) Liquidated damages are set at ten percent of the amount of contributions owed. (Id.) According to Plaintiffs' auditors, Defendant owes a total of $23,875.50 in late payment charges for these contributions during the period October 1998 through March 2000. (Id. at 6, Exs. 4 and 5.) Defendant objects to Plaintiffs' proposed liquidated damages, claiming that Plaintiffs waived any right to recover such damages by failing to specify in their complaint the specific amount that Defendant owed based on late contributions. (Def.'s Mem., at 9.) Defendant, however, fails to cite any authority for the proposition that a failure to specifically allege the exact basis of its claims for liquidated damages results in a waiver. Moreover, given the state of Defendant's records, the amount of damages to which Plaintiffs were entitled, if any, did not become clear until after the completion of the audit. The specificity with which Plaintiffs pleaded damages in the complaint was necessarily limited by this fact.

Plaintiffs present sufficient evidence, in the form of the audit records, that Defendant made a series of tardy contributions to the Funds. Plaintiffs' audit calculations set the amount of liquidated damages owed at $23,875.50 (Exs. 4 and 5 to Pls.' Mem.), although Plaintiffs seek only $23,000.00. (Pls.' Mem., at 6.) As noted earlier, Plaintiffs are not entitled to any damages arising prior to November 31, 1998, as they have waived all claims prior to this date in a previous settlement. (Def.'s Mem., at 9; Ex. D to Def.'s Mem. ¶¶ 3, 4, 7.) Thus, Plaintiffs' $23,000 figure will be reduced by the interest due for late contributions in September and October, 1998: $5044.18. (Ex. 4 to Pls.' Mem.) The court thus awards Plaintiffs $17,955.82 in accumulated liquidated damages arising from late contributions to the Funds for the period December 1, 1998 through March 31, 2000.

V.      **Payroll and Cash Disbursements**

The parties appear to have reached some agreement as to the amount Defendant owes

Plaintiffs in benefits based on "payroll and cash disbursements." Defendant concedes to owing $776.81 based on Plaintiffs' payroll audit. (Def.'s Mem., at 1-2.) Plaintiffs, in their supplemental brief on damages, reduce their request to $712.08 without explanation. (Pls.' Mem., at 9.) The court accepts this lower number. Plaintiffs are hereby awarded $712.08 in satisfaction of payroll and cash disbursements shown to be due by the audit. This amount consists of $3.85 in contributions and $0.38 for ten percent liquidated damages to the Welfare Fund of PDC 14 and $643.50 in contributions and $64.35 for ten percent liquidated damages to PDC 33's Welfare & Pension Funds. (Ex. C to Pls.' Mem.)

## CONCLUSION

The court hereby awards Plaintiffs $30,508.13 in unpaid contributions from October 1, 1999 through March 31, 2000 and $68,266.16 in liquidated damages accrued during this period. The court also awards Plaintiffs $17,955.82 in accumulated liquidated damages arising from late contributions to the Funds for the period December 1, 1998 through March 31, 2000 and $712.08 in owed payroll and cash disbursements. Finally, the court orders Defendant to open its records to a further audit of its payroll and materials records for the period from December 1, 1998 through September 30, 1999. Status conference for determination of the results of this audit is set for December 16, 2004 at 9:00 a.m.

ENTER:

Dated: November 19, 2004

REBECCA R. PALLMEYER
United States District Judge